490 S.E.2d 754

**Ward W. KEESECKER, II, Plaintiff Below, Appellant,**

v.

**Walter M. BIRD, Committee for Emily Keesecker, and Arch Steiner, Committee for Emily Keesecker, Defendants Below, Appellees.**

**No. 23386.**

Supreme Court of Appeals of West Virginia.

Submitted Feb. 4, 1997.

Decided July 14, 1997.

Richard G. Gay, Berkeley Springs, for Appellant Keesecker.

Christopher D. Janelle, Martinsburg, for Appellee Bird.

Charles S. Trump, IV, Berkeley Springs, for Appellee Steiner.

STARCHER, Justice:

This case involves the application of summary judgment to claims of waste to a remainderman's interest in real and personal property. The plaintiff-appellant, Ward Keesecker, II, is the owner of a remainder interest in property bequeathed by will to Emily Keesecker for her life. The defendant-appellees, Walter M. Bird and Arch Steiner, were appointed by the circuit court of Arlington County, Virginia as the personal representatives over Emily Keesecker's affairs between 1981 and her death in 1993.[1] The appellant alleges that the appellees, while overseeing Emily Keesecker's affairs, negligently allowed the property in the life estate to deteriorate, and subsequently permitted the property to be mostly destroyed.

This appeal is the result of the circuit court's granting of summary judgment to the appellees. The circuit court ruled (1) that appellee Bird was "not a proper party" to this litigation, and (2) that the statute of limitations barred all claims against appellee Steiner. We find that the circuit court's summary judgment order as to appellee Bird is inadequate because it fails to identify the circuit court's factual and legal analysis, and

we also hold that the circuit court incorrectly applied the "real party in interest" analysis found in *West Virginia Rules of Civil Procedure* ("*W.Va.R.Civ.P.*") Rule 17(a) [1978]. However, with respect to appellee Steiner, the record establishes that while Steiner was managing the property between 1981 and 1986, the appellant knew that waste was occurring, knew that Steiner last managed the property in 1986, and knew that Steiner's conduct may have caused or contributed to the property damage, yet the appellant waited over six years to initiate this lawsuit against Mr. Steiner. As such, the appellant's claims against appellee Steiner are barred by the applicable two-year statute of limitation. Accordingly, we reverse the circuit's order as to Mr. Bird, affirm the order dismissing the claims against Mr. Steiner, and remand the case for further proceedings.

## I.

### Facts and Background

In late 1974, Ward W. Keesecker, Sr., ("Dr.Keesecker") and his second wife, Emily M. Keesecker, who were both residents of Morgan County, West Virginia, were involved in an automobile accident. Dr. Keesecker died from his injuries on January 24, 1975. Emily Keesecker was hospitalized and later moved to a nursing home where she remained until her death on May 15, 1993. Testimony by the parties indicates that she was comatose for the last nine years of her life.

In his will, Dr. Keesecker gave certain real and personal property to Emily Keesecker for her life, and upon her death the remainder was to go to his son (by his first marriage), appellant Ward W. Keesecker, II. The real property, Highwood House, was a large home located in Berkeley Springs, West Virginia with more than 20 rooms and four floors. One insurance agent inspected the home in 1984 and found it had a replacement cost of $361,878.00, while another agent estimated the replacement value at $207,981.00.

---

**1.** As is further discussed in Section I, Emily Keesecker was seriously injured in an auto accident in 1974. The record is unclear how she managed her affairs between the time of the 1974 accident and the appointment of appellee Steiner as her committee in 1981, and unclear about when she was moved to a nursing home in Arlington County, Virginia.

The personal property in the life estate consisted of the contents of Highwood House. The appellant alleges that the home was filled with antiques.

At some point prior to 1981, Emily Keesecker was moved to a nursing home in Arlington County, Virginia. On May 1, 1981, the Circuit Court of Arlington County, Virginia, appointed appellee Arch Steiner as "Committee of the estate of Emily M. Keesecker." Mr. Steiner moved to Tennessee in 1986, and on June 26, 1986 the Circuit Court of Arlington County, Virginia entered an order relieving Mr. Steiner of his duties and appointing appellee Walter Bird[2] as committee for Emily Keesecker. Mr. Steiner prepared a seven-page, single-spaced inventory listing the contents of each room of Highwood House and stated that these items were transferred to Mr. Bird. In his deposition, Mr. Bird acknowledged he inspected the house and signed the inventory list accepting the property.

Over the years of Mr. Bird's tenure as committee for the estate of Emily Keesecker, Highwood House was burglarized numerous times. Mr. Bird testified that he recalled reporting to the police more than a dozen thefts of personal property from Highwood House. No one was ever arrested for these burglaries. Mr. Bird also gave somewhat contradictory testimony about whether he sought indemnity for these losses from the homeowner's insurance company.[3] He testified that he never made any claims for losses or damages to the insurance company for any of these breaking and enterings, but he later said he had simply called his insurance agent to report these crimes. Mr. Bird testified the insurance agent said he would get back to him, but he "never heard anything back."

Accounting statements filed by Mr. Bird reflect income from the rental of Highwood House between June 1986 and June 1990, in addition to Emily Keesecker's pension and social security checks. By 1990, it appears that Mr. Bird became unable to rent the Highwood property. He boarded up the windows and padlocked the doors. Because the property was unoccupied, the homeowner's insurance company canceled all insurance policies on Highwood House effective January 26, 1990. Mr. Bird contacted his personal insurance agent and discussed insuring the property through another company, but later told the agent that he did not wish to purchase insurance coverage at that time.

On November 30, 1990, the Virginia Commissioner of Accounts wrote to Mr. Bird stating that the Commissioner would no longer approve disbursements from Mrs. Keesecker's estate account to pay for utilities, maintenance, or repairs to the house. The letter advised Mr. Bird to consider selling the house or abandoning it if it was of no value. It appears that Mr. Bird then listed the house with a local real estate company and indicated the selling price was $78,000.[4]

In April or May 1991, Mr. Bird returned to his insurance agent's office and asked about the possibility of insuring Highwood House. The insurance agent assisted Mr. Bird in completing an application for homeowner's insurance. However, in his deposition, the insurance agent testified that he did not process the application because Mr. Bird never paid the premiums for coverage.

On December 11, 1991, Mr. Bird wrote to appellant Ward Keesecker, II, saying that he had located a buyer willing to pay $78,000 for Highwood House and that he needed Mr. Keesecker to sign a contract approving the sale. Mr. Keesecker testified in his deposition that he received the letter but did not respond because he was not interested in selling his interest in the house. Two weeks after this letter was sent, on December 26, 1991, Highwood House was severely damaged in a fire of suspicious origin.

---

2. The record does not show how Mr. Bird is related to the Keesecker family. As best we can determine, it appears that his only relationship to Mrs. Keesecker was that he owned property known as Berkeley Castle, a home formerly owned by Dr. Keesecker and situated next-door to Highwood House.

3. The record does suggest that Mr. Bird had purchased $5,000 in personal property insurance on Highwood House.

4. The record does not state whether Mr. Bird intended to sell Mrs. Keesecker's life estate share of the property for $78,000, or the entire fee simple.

On April 17, 1992, Mr. Bird initiated a lawsuit against Mr. Keesecker to force the sale of the house. The complaint alleges that Mr. Bird had located a buyer for Highwood House, and because of the expense of upkeep for the house, it was in the best interest of Mrs. Keesecker (the life tenant) that the fee simple interest in the property be sold. Accordingly, appellee Bird asked that the trial court compel the sale of Highwood House, and use the interest and income from the sale proceeds for the support of Mrs. Keesecker.[5] Appellant Keesecker answered the complaint and filed a counterclaim against appellee Bird and a third-party complaint against appellee Steiner alleging they committed waste to the property by failing to preserve Highwood House and its contents. The circuit court's granting of summary judgment on the counterclaim and the third-party complaint are the basis for this appeal.[6]

Subsequently, a second fire occurred at Highwood House on January 27, 1993, and while the extent of damage is not stated in the record, the testimony of the parties suggests that the house was virtually destroyed. Mrs. Keesecker died on May 15, 1993.

Both Mr. Bird and Mr. Steiner filed motions for summary judgment alleging that they were not proper parties to this action because they acted as fiduciaries and could not be held personally responsible for the debts of Emily Keesecker's estate. Accordingly, they insisted that the sole party defendant should be the estate of Mrs. Keesecker. Both appellees further argued that they did not commit waste, and could not be held responsible for waste even if it did occur. Lastly, Mr. Steiner alone argued that all claims against him were barred by the statute of limitation.

On August 18, 1995, the circuit court issued two brief orders granting Mr. Bird's and Mr. Steiner's motions for summary judgment. The circuit court dismissed the actions against Mr. Bird because he was "not a proper party to the instant litigation."[7] The actions against Mr. Steiner were dismissed as barred by the statute of limitation.[8] It is

5. It appears that appellee Bird did not give any consideration to the fact that Mrs. Keesecker owned only a life estate interest in the property and that the remainder was owned by appellant Ward Keesecker, II.

6. Subsequent to Mrs. Keesecker's death, the trial court dismissed Mr. Bird's complaint and realigned the parties. Accordingly, Mr. Keesecker was restyled as the plaintiff, and Mr. Bird and Mr. Steiner as the defendants.

7. The circuit court's order as to appellee Bird states, in its entirety:

This matter came before the Court this 18th day of August, 1995 upon motion of the Defendant, Walter M. Bird, for summary judgment pursuant to Rule 56 of the West Virginia Rules of Civil Procedure, upon the response of the Plaintiff, and the Defendant Arch Steiner, and upon the reply of the movant. It appearing to the Court that the facts underlying Defendant Bird's Motion for Summary Judgment are not in dispute, that Walter M. Bird is not a proper party to the instant litigation, and that due to the foregoing, Defendant Bird is entitled to judgment as a matter of law; it is accordingly ADJUDGED and ORDERED that all claims against the Defendant Walter M. Bird are hereby DISMISSED, without prejudice.

The Clerk shall enter the foregoing as of the day and date first written above and shall transmit attested copies thereof to all counsel of record.

8. The circuit court's order as to appellee Steiner states, in its entirety:

This matter became mature for a decision this 18th day of August, 1995, upon the papers, pleadings and ORDERS formerly had and read herein; upon the motions for summary judgment filed by all parties herein; upon the memoranda and argument submitted by the parties in support of and in opposition to said motions.

Based upon all of the foregoing, the Court is of the opinion that summary judgment is appropriate in favor of the Defendant Arch Steiner and against the Plaintiff Ward Keesecker II. In granting this motion, the Court finds that the record in this case establishes that the total destruction of the property in which the Plaintiff had a remainder interest happened more than five years after the Defendant Arch Steiner had been replaced as Emily Keesecker's committee, which resignation and replacement occurred on the 26th day of June, 1986.

Accordingly, the Plaintiff's claims against the Defendant Arch Steiner, are dismissed with prejudice and the Defendant shall have and recover his costs in this behalf expended. The Court notes the timely exception of the Plaintiff to the Court's ruling. The Clerk shall enter the foregoing ORDER on and for the day and date abovefirst [sic] written, and the Clerk shall send attested copies hereof to all counsel of record.

from these two orders that Mr. Keesecker now appeals.

## II.

### Standard of Review

■ We first consider the appropriateness of summary judgment under *W.Va. R.Civ.P.* Rule 56 [1978]. As we stated in Syllabus Point 1 of *Painter v. Peavy,* 192 W.Va. 189, 451 S.E.2d 755 (1994), we review a circuit court's entry of summary judgment *de novo.* The traditional standard for granting summary judgment was established in Syllabus Point 3 of *Aetna Casualty & Surety Co. v. Federal Ins. Co. of N.Y.,* 148 W.Va. 160, 133 S.E.2d 770 (1963) where we held:

> A motion for summary judgment should be granted only when it is clear that there is no genuine issue of fact to be tried and inquiry concerning the facts is not desirable to clarify the application of the law.

*In accord,* Syllabus Point 1, *Fayette Co. National Bank v. Lilly,* 199 W.Va. 349, 484 S.E.2d 232 (1997); Syllabus Point 1, *Williams v. Precision Coil, Inc.,* 194 W.Va. 52, 459 S.E.2d 329 (1995); Syllabus Point 2, *Painter, supra;* Syllabus Point 1, *Andrick v. Town of Buckhannon,* 187 W.Va. 706, 421 S.E.2d 247 (1992).

■ In *Fayette Co. National Bank, supra,* we mandated that "an order granting summary judgment cannot merely recite and rest exclusively upon a conclusion that, 'No genuine issue of material fact is in dispute and therefore summary judgment is granted.'" 199 W.Va. at 353, 484 S.E.2d at 236. This Court must "determine whether the stated reasons for the granting of summary judgment by the lower court are supported by the record." *Id.* In order to accomplish this, a circuit court must identify the factual and legal support for its ultimate conclusions. We therefore held that:

> Although our standard of review for summary judgment remains de novo, a circuit court's order granting summary judgment must set out factual findings sufficient to permit meaningful appellate review. Findings of fact, by necessity, include those facts which the circuit court finds relevant,

determinative of the issues and undisputed.

Syllabus Point 3, *Fayette County National Bank.* With these standards in mind, we review the circuit court's orders.

## III.

### Discussion

#### A.

### Summary Judgment as to Appellee Bird

#### i.

### Adequacy of the Circuit Court's Order

In *Fayette County National Bank, supra,* we examined an order with language similar to that used by the circuit court in its summary judgment order regarding Mr. Bird. The circuit court's order in *Fayette County National Bank* simply stated:

> The Court having maturely considered ... said Motion, it is the opinion of the Court that the relief prayed for should be granted, as is more fully set out in that letter dated June 8, 1995, the original of which is attached hereto and made a part hereof.

The referenced letter of June 8 provided:

> The Court has considered plaintiff's motion for summary judgment, and after considering counsel's memorandums and argument is of the opinion that the motion should be granted, there being no genuine issues that exist as to material facts in this action for deficiency judgment.

We concluded that the above-stated "summary judgment findings by the circuit court ... do not rise to the level of 'meaningful' findings required by the holding we have made today." 199 W.Va. at 354, 484 S.E.2d at 237.

■ Our examination of the circuit court's order in the case *sub judice* leads us to the same conclusion. The circuit court dismissed the appellant's lawsuit against appellee Bird by stating:

> It appearing to the Court that the facts underlying Defendant Bird's Motion for Summary Judgment are not in dispute, that Walter M. Bird is not a proper party to the instant litigation, and that due to the

foregoing, Defendant Bird is entitled to judgment as a matter of law. . . .

We believe that, with this order, the circuit court failed to make the meaningful findings required by *W.Va.R.Civ.P.* Rule 56 and *Fayette County National Bank.* The findings in the Bird order are conclusory, and the order does not contain those findings of fact which were relevant, determinative of the issues and undisputed. The order is devoid of descriptive factual findings, contains no discussion of the numerous legal issues raised by the parties and is therefore inadequate. Accordingly, we reverse the circuit court's August 18, 1995 order regarding claims against appellee Bird and remand the case for full consideration.

*ii.*

*Real Party in Interest Analysis*

The circuit court dismissed appellee Bird because he was "not a proper party to the instant litigation." The parties agree that the circuit court's decision was based upon *W.Va.R.Civ.P.* Rule 17(a) [1978], which requires that actions be brought in the name of the "real party in interest."

■ Where an issue on appeal from the circuit court is clearly a question of law or involves an interpretation of a statute, we apply a *de novo* standard of review. Syllabus Point 1, *Chrystal R.M. v. Charlie A.L.*, 194 W.Va. 138, 459 S.E.2d 415 (1995). An interpretation of the *West Virginia Rules of Civil Procedure* likewise presents a question of law subject to a *de novo* review.

*W.Va.R.Civ.P.* Rule 17(a) states:

(a) *Real Party in Interest.* Every action shall be prosecuted in the name of the real party in interest. An executor, administrator, guardian, bailee, trustee of an express trust, or any other fiduciary, a party with whom or in whose name a contract has been made for the benefit of another, or a party authorized by law may sue in his own name without joining with him the party for whose benefit the action is brought. When a law of the state so provides, an action for the use or benefit of another shall be brought in the name of the state or any political subdivision there-

of. No action shall be dismissed on the ground that it is not prosecuted in the name of the real party in interest until a reasonable time has been allowed after objection for ratification of commencement of the action by, or joinder or substitution of, the real party in interest; and such ratification, joinder, or substitution shall have the same effect as if the action had been commenced in the name of the real party in interest.

Rule 17(a) does not specifically define the term "real party in interest." "About the best that can be said for [Rule] 17 is that it conveys a certain amount of correct information about naming plaintiffs." *Virginia Elec. & Power Co. v. Westinghouse Elec. Corporation,* 485 F.2d 78, 82 (4th Cir.1973). While Rule 17(a) was originally "intended to expand the class of those who may sue to include persons having an equitable or beneficial interest, the rule is unfortunately susceptible to efforts to prevent prosecution of claims as illustrated by this appeal. Ingenious counsel are enabled to present yet another 'decision point' resulting in extravagant expenditures of time and effort before ever reaching the merits." 485 F.2d at 83.

■ Our reading of the language of Rule 17(a) is that it plainly indicates that its analysis applies only to claimants, that is, individuals who "prosecute[ ]," "sue," or who may bring a lawsuit in the name of the state or others. The real party in interest analysis focuses upon a plaintiff, defendant, petitioner, or intervenor that is asserting a claim, counter-claim or cross-claim, as opposed to a defendant or respondent, that is, the persons against whom a claim is made.

The purpose of Rule 17(a) is not to simply identify a party by the correct title, but to ensure that the party who makes a claim possesses, under substantive law, the right sought to be enforced. *Hanna Mining Co. v. Minnesota Power and Light Co.,* 573 F.Supp. 1395, 1397, (D.C.Minn.1983), *aff'd,* 739 F.2d 1368 (8th Cir.1984). The initial purpose of the rule was to broaden the scope of claimants, from the holder of the claim to representatives of the holders of claims. The *Committee Note of 1966 to Amended Federal Rule of Civil Procedure 17(a)* states, in part:

In its origin the rule concerning the real party in interest was permissive in purpose: it was designed to *allow* an assignee to sue in his own name. That having been accomplished, the modern function of the rule in its negative aspect is simply to protect the defendant against a subsequent action by the party actually entitled to recover, and to insure generally that the judgment will have its proper effect as res judicata.

4 James W. Moore, *Moore's Federal Practice, 3d Edition* § 17 App.04.[9]

 We therefore hold that the purpose of *W.Va.R.Civ.P.* Rule 17(a) is to ensure that the party who asserts a cause of action possesses, under substantive law, the right sought to be enforced. *W.Va.R.Civ.P.* Rule 17(a) allows circuit courts to hear only those suits brought by persons who possess the right to enforce a claim and who have a significant interest in the litigation. *Virginia Elec. & Power Co.*, 485 F.2d at 83. The requirement that claims be prosecuted only by a real party in interest enables a responding party to avail himself of evidence and defenses that he has against the real party in interest, to assure him of finality of judgment, and to protect him from another suit later brought by the real party in interest on the same matter. *Celanese Corp. of America v. John Clark Industries*, 214 F.2d 551, 556 (5th Cir.1954). In its modern formulation, Rule 17(a) protects a responding party against the harassment of lawsuits by persons who do not have the power to make final and binding decisions concerning the prosecution, compromise, and settlement of a claim. *Campus Sweater and Sportswear Co. v. M.B. Kahn Const. Co.*, 515 F.Supp. 64, 81 (D.S.C.1979), *aff'd*, 644 F.2d 877 (4th Cir. 1981).

 Thus, the concept of a "real party in interest" addresses a litigant's right to pursue an action as a claimant. A defendant can be a real party in interest, if asserting a claim. *National Safe Corp. v. Texidor Sec. Equipment, Inc.*, 101 F.R.D. 467 (D.P.R. 1984). *See also W.Va.R.Civ.P.* Rule 13 [1978] (compulsory and permissive counterclaims, and cross-claims against co-parties). A similar analysis applies to intervening parties. *New Orleans Public Service, Inc. v. United Gas Pipe Line Co.*, 732 F.2d 452, 464 (5th Cir.), *cert. denied sub nom, Morial v. United Gas Pipe Line Co.*, 469 U.S. 1019, 105 S.Ct. 434, 83 L.Ed.2d 360 (1984).

The language of Rule 17(a) expressly authorizes a real party in interest to sue on behalf of, or for the benefit of, another. Many of the examples of real parties in interest listed in the rule are individuals with some fiduciary interest (executors, administrators, guardians, bailees, trustees of an express trust, etc.), individuals who are charged with the responsibility of adequately representing another's interests. *See* 4 James W. Moore, *Moore's Federal Practice, 3d Edition*, § 17.10[3]. In *Richardson v. Kennedy*, 197 W.Va. 326, 475 S.E.2d 418 (1996), we noted that the personal representative of a decedent's estate, while a nominal party in a wrongful death claim, is still a real party in interest who may initiate a wrongful death action on behalf of the decedent's beneficiaries against a tortfeasor.

 However, simply because a claimant falls into one of the categories of persons listed in Rule 17(a) does not end the analysis; the claimant must still establish they have a right under the substantive law to initiate a lawsuit to enforce some right.

> [T]he mere fact that plaintiff falls within one of the classes of persons enumerated in Rule 17(a) is not dispositive of the real party in interest question, for that rule assumes that the enumerated persons are granted the right to sue by the applicable substantive law.

---

**9.** There are critics of *Fed.R.Civ.P.* Rule 17(a), which is identical to *W.Va.R.Civ.P.* Rule 17(a):

> Rule 17(a) is a barnacle on the federal practice ship. It ought to be scraped away. If it were, some fear that lawyers would point to its absence and argue that the ship is somehow different without it. But [*Fed.R.Civ.P.*] Rules 19, 17(b) and substantive rules as to stating a claim for relief are adequate without interject-

ing the meaningless, logically inconsistent commands of the real party in interest rule. The solution is to abolish it with the explanation that it is a fascinating historical growth but it is no longer necessary.

John E. Kennedy, *Federal Rule 17(a): Will the Real Party in Interest Please Stand?*, 51 Minn. L.Rev. 675, 724 (1967).

*Lubbock Feed Lots, Inc. v. Iowa Beef Processors, Inc.,* 630 F.2d 250, 257 (5th Cir.1980). *See also, Childers v. Eastern Foam Products, Inc.,* 94 F.R.D. 53, 55 (N.D.Ga.1982); *See v. Emhart Corp.,* 444 F.Supp. 71, 73 (W.D.Mo.1977); *Virginia Elec. & Power Co.,* 485 F.2d at 83; *United States v. 936.71 Acres of Land,* 418 F.2d 551, 556 (5th Cir.1969).

■ Plaintiff-appellant Keesecker argues that defendant-appellee Bird is a "proper party" in this action because Mr. Bird was a "guardian" or "other fiduciary" as listed in Rule 17(a). The circuit court ruled instead that Mr. Bird was "not a proper party." We believe that this analysis is backwards; the test under Rule 17(a) is whether *Mr. Keesecker* is a real party in interest, for he is the party prosecuting a claim for waste to the life estate and damage to his remainder interest. As the defending party to that claim, Mr. Bird is not subject to the real party in interest analysis.[10]

■ We conclude that the circuit court in this case erred by ruling that defendant Bird was "not a ·proper party" under *W.Va. R.Civ.P.* Rule 17(a). The focus of the Rule 17(a) analysis should have been on Mr. Keesecker's right and interest in prosecuting an action for waste to his interest in property, and not whether Mr. Bird was a proper defendant. Mr. Keesecker is undoubtedly

the owner of the remainder interest in the life estate property. Accordingly, it appears that the appellant, Mr. Keesecker, has both a sufficient interest in the litigation and may be entitled under the substantive law to recover for damages to his remainder interest. Therefore, Mr. Keesecker is a real party in interest entitled to pursue his action for waste.

■ However, as we have previously noted, the parties agree that the circuit court's summary judgment ruling relied upon Rule 17(a)'s "real party in interest" principles to find that Mr. Bird was not a proper party defendant. As we have shown, Rule 17(a) applies to parties prosecuting claims, not parties defending against claims. Therefore, the circuit court erred in relying upon Rule 17(a) to dismiss Mr. Bird as a defendant.[11]

*iii.*

*Choice of Law*

Because we reverse the decision of the circuit court dismissing Mr. Bird as a defendant and remand this case for further proceedings on appellant's claims against Mr. Bird, we address a purely legal issue which may arise upon remand.

All of the parties in this case converge their arguments on the duty of care owed by

**10.** As discussed in the text, *W.Va.R.Civ.P.* Rule 17(a) relates exclusively to a party prosecuting or initiating a claim (whether they are a plaintiff, defendant, intervenor or otherwise), and requires that the individual be a "real party in interest." *W.Va.R.Civ.P.* Rule 17(c) tends to confuse the matter, as it discusses representatives who may "sue or defend[.]" Rule 17(c) relates to the legal capacity of the individuals participating in the litigation.

Under *W.Va.R.Civ.P.* 17(c), whenever an infant, incompetent person, or convict has a duly qualified representative, such as a guardian, curator, committee or other like fiduciary, such representative may sue or defend on behalf of the infant, incompetent person, or convict. If a person under any disability does not have a duly qualified representative he may sue by his next friend. The court shall appoint a discreet and competent attorney at law as guardian ad litem for an infant, incompetent person, or convict not otherwise represented in an action, or the court shall make such other order as it deems proper for the protection of any person under disability.

Syllabus Point 3, *State ex rel. McMahon v. Hamilton,* 198 W.Va. 575, 482 S.E.2d 192 (1996). To

be clear, however, capacity to sue or be sued under Rule 17(c) is *not* the equivalent of real party in interest status under Rule 17(a).

Capacity is a broader concept, aimed at assessing a litigant's *general ability or power* to sue or be sued. The real party in interest inquiry is more specific, aimed at assessing whether the litigant is the holder of the right to be vindicated *in a particular case.* While all litigants—plaintiff and defendant—must have capacity, only those asserting claims must be real parties in interest[.]

4 James W. Moore, *Moore's Federal Practice, 3d Ed.* § 17.20[2].

**11.** If it is assumed *arguendo* that under West Virginia law a conservator can be personally liable for the negligent, reckless or intentional waste of a remainderman's interest in property, then Mr. Bird is a facially proper defendant in this litigation. However, this legal issue was not addressed by the circuit court in its summary judgment order or otherwise. The circuit court, on remand, should determine and evaluate the factual circumstances and address this legal question in the first instance. *See* Section III.A.i, *infra.*

the appellees to the late Mrs. Keesecker and to the appellant. However, the parties disagree over what law governs those duties. The appellant argues that because the life estate property is located in West Virginia, West Virginia law alone controls the duties of the parties. Appellee Bird argues that Virginia law controls his duties towards Mrs. Keesecker's estate; Bird does not directly address what that law might be.

We believe that on remand the circuit court must determine Mr. Bird's duties towards the estate of Emily Keesecker under both Virginia and West Virginia law.

 First, Mr. Bird's committeeship was established in Virginia, according to Virginia law, by a Virginia court, and he was supervised by a Virginia Commissioner of Accounts. Therefore, the circuit court must initially determine whether Virginia law imposed a duty upon Mr. Bird to manage Emily Keesecker's real and personal property, wherever located. Whether or not Mr. Bird was supposed to stand in Emily Keesecker's shoes and care for Highwood House and its contents is to be determined by Virginia law.[12]

 Second, if it is determined that Virginia law established a duty upon appellee

Bird to manage the real and personal property located in West Virginia, then the next question—*how* appellee Bird was to manage that property—is to be determined by West Virginia law. It is a universal principle of law that real property is subject to the law of the country or state within which it is situated. *See, e.g., United States v. Crosby,* 7 Cranch 115, 116, 11 U.S. 115, 116, 3 L.Ed. 287 (1812); 16 Am.Jur.2d *Conflicts of Laws,* § 24. *See also, In re Rumford's Will,* 66 W.Va. 39, 42, 66 S.E. 10, 12 (1909) ("In respect to passing of title to real estate the *lex loci rei sitae* governs...."); Syllabus Point 2, *In re Briggs' Estate,* 148 W.Va. 294, 134 S.E.2d 737 (1964) (validity of a will with respect to personalty governed by the laws of the place of testator's last domicile, and with respect to realty, the laws of the place where the realty is situated; the place where the will was executed is without legal significance).

 All matters concerning the taxation of realty, title, alienation, and the transfer of realty and the validity, effect, and construction which is accorded agreements intending to convey or otherwise deal with such property are determined by the doctrine of *lex loci rei sitae,* that is, the law of the place where the land is located. *Matter of Grayco Land Escrow, Ltd.,* 57 Haw. 436,

---

**12.** The parties did not brief, nor did the trial court consider, the standard of care which must be exercised by a fiduciary towards a ward in Virginia. In West Virginia, we hold fiduciaries to the highest standard of care towards their ward, as recognized by Justice Cardozo:

> Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior. As to this there has developed a tradition that is unbending and inveterate. Uncompromising rigidity has been the attitude of courts of equity when petitioned to undermine the rule of undivided loyalty by the 'disintegrating erosion' of particular exceptions.... Only thus has the level of conduct for fiduciaries been kept at a level higher than that trodden by the crowd....

*Kanawha Valley Bank v. Friend,* 162 W.Va. 925, 928–29 n. 2, 253 S.E.2d 528, 530 n. 2 (W.Va. 1979), *quoting Meinhard v. Salmon,* 249 N.Y. 458, 464, 164 N.E. 545, 546 (1928).

In Virginia, a committee is appointed for the purpose of securing a competent person to manage the property of an incompetent adult. *Shands v. Shands,* 175 Va. 156, 160, 7 S.E.2d 112, 113 (1940). In *Somers v. Godwin,* 182 Va. 144, 152, 27 S.E.2d 909, 912 (1943), the Virginia Supreme Court noted that Virginia statutes give a committee "possession of his [ward's] estate[.]" The committee "shall take care of and preserve such estate and manage it to the best advantage...." *Id. See also Va.Code,* 37.1–142 [1990] (repealed effective January 1, 1998). The Virginia Court noted in *Somers* that a committee is "charged with the performance of his duties with the highest fidelity and with the utmost good faith and loyalty to the trusts imposed on him." 182 Va. at 154, 27 S.E.2d at 913. *See also Crisman v. Swanson,* 193 Va. 247, 253, 68 S.E.2d 502, 506 (1952) (Property was placed in trust for incompetent widow; "During her life the trustee could use the property only for the purpose and within the limits of the trust upon which it was given; that is, for the comfortable care of the wife. The purpose to which it could apply it was thus limited. For faithlessness to its trust, it [the trustee] would be accountable before a court of equity to those injured.")

449, 559 P.2d 264, 274 (1977). Every state has plenary jurisdiction and control of the property, real and personal, located within its borders. *In re Ray's Estate,* 74 Wyo. 317, 330, 287 P.2d 629, 634 (1955), *quoting In re Smith's Estate,* 55 Wyo. 181, 200, 97 P.2d 677, 684 (1940).

▮▮▮▮ We therefore hold that the choice of law doctrine of *lex loci rei sitae* controls as to property located in this State. The doctrine of *lex loci rei sitae* exists because it is particularly important that there be certainty, predictability and uniformity of result and ease in the determination and application of

**13.** On the one hand, we continue to follow the common law maxim of *mobilia sequuntur personam,* a "convenient 'fiction'" that the law of the domicile of the person governs the taxation of intangible personal property. *In re Wheeling Steel Corp. Assessment,* 115 W.Va. 553, 556, 177 S.E. 535, 536–537 (1934), *aff'd sub nom., Wheeling Steel Corp. v. Fox,* 298 U.S. 193, 56 S.Ct. 773, 80 L.Ed. 1143 (1936); *In re Wheeling Steel Corp. Assessment,* 137 W.Va. 653, 668–69, 73 S.E.2d 644, 653 (1952). *See also Watson v. Town of Fairmont,* 38 W.Va. 183, 186, 18 S.E. 467, 468 (1893), *citing City of Wheeling v. Hawley,* 18 W.Va. 472, 476 (1881) ("It is also the settled law of this state ... 'that money, credits, securities and investments follow the person.'"). On the other hand, tangible personal property continues to be exclusively subject to the laws of the state where it is permanently located, regardless of the domicile of the owner. *Wheeling Steel Corp. v. Fox,* 298 U.S. at 208–9, 56 S.Ct. at 776, 80 L.Ed. at 1147. The United States Supreme Court held in *Frick v. Pennsylvania,* 268 U.S. 473, 45 S.Ct. 603, 69 L.Ed. 1058 (1925) that the power to tax tangible personal property rests exclusively in the state where the property has an actual situs. "By this decision, the ancient maxim, mobilia sequuntur personam, as applied to tangible personal property was eliminated root and branch, but the maxim was applied to intangibles." *Commonwealth v. Appalachian Electric Power Co.,* 159 Va. 462, 466, 166 S.E. 461, 462 (1932).

**14.** Assuming, *arguendo,* that Virginia law imposed on the appellees a duty to manage the West Virginia property, then the primary issue in contention is whether under West Virginia law appellee Bird, as a fiduciary for Emily Keesecker, can be held personally responsible for waste to the appellant's remainder interest in the property. We can find no case law addressing this detailed fact pattern, and counsel for the parties have not referred us to any. However, we note that subsequent to 1994, the West Virginia Guardianship and Conservatorship Act addresses a fiduciary's personal liability for negligent actions. *W.Va.Code,* 44A–3–14 [1994] states, in part:

the law to be applied concerning the transaction of property and the management of property.[13] Accordingly, if the appellees, under Virginia law, owed Emily Keesecker a duty to manage her real and personal property located in West Virginia, then the method of caring for the property was to be guided by West Virginia law.[14]

## B.

### *The Circuit Court's Summary Judgment as to Appellee Steiner*

Appellant Keesecker testified in his deposition that he was aware that his father's will

> (a) A conservator shall have a fiduciary duty to the protected person for whom he or she was appointed conservator and may be held personally liable for a breach of that duty.
>
> . . . .
>
> (c) A conservator is personally liable for obligations arising from ownership or control of property of the estate or for torts committed in the course of administration of the estate only if personally negligent.

The Act defines "conservator" as someone "responsible for managing the estate and financial affairs of a protected person...." *W.Va.Code,* 44A–1–4(1) [1994]. The Act was passed after Mrs. Keesecker's 1993 death, and while instructive, it is not applicable to the instant case.

The parties also dispute the level of repairs which the appellees should have performed on Highwood House. The appellees contend the house required extraordinary repairs, and a life tenant is only required to make ordinary repairs. Further, the appellees contend that there were insufficient funds in Emily Keesecker's estate to pay for repairs. The parties have not addressed the losses to the personal property in the life estate, and whether the theft of and/or damage of such personal property constitutes waste. *See, e.g., Bartlett v. Patton,* 33 W.Va. 71, 10 S.E. 21 (1889) (where chattels are given by will to a person for life, that person (or their estate) may be accountable for chattels sold and converted, unless the chattels are to be consumed in their use). Questions also remain whether destruction of Highwood House by fire constitutes permissive waste. Additionally, the parties need to address whether appellee Bird may be held responsible for failing to seek indemnity for those losses to the insurer of Highwood House. *See, Johnson v. Chapman,* 43 W.Va. 639, 28 S.E. 744 (1897) (a life tenant is entitled to sue for damages to estate property). It appears that these questions could involve a determination of what, under the circumstances, would have been reasonable; such questions may be for a jury.

Lastly, a significant legal question which the circuit court may be called upon to address is the issue of whether Emily Keesecker's estate had a duty to insure Highwood House against fire.

had created a life estate of Highwood House for Emily Keesecker, "and upon her passing it would be mine and all the contents." During the period appellee Steiner managed Emily Keesecker's affairs, the appellant testified he would visit the Highwood property at least once a year. The appellant knew that Mr. Steiner was acting as his step-mother's committee, and testified that Mr. Steiner had tried to buy his interest in the estate. During Mr. Steiner's tenure as committee, the appellant noted that the real property was falling into a state of disrepair, and that the personal property also was not being cared for. The appellant held the opinion that the

"serious dilapidation of the house" commenced the day his father died in 1975.

The appellant was not immediately aware of the change of committee over his step-mother's estate in 1986. However, he testified in his deposition that he

... just had hearsay, people had said ... [and] I believed from what I had heard that Mr. Bird was managing the estate, which I guess I would assume was committee because Mr. Steiner had moved to Tennessee and left Mr. Bird in charge. That was my understanding.

Although the record is unclear on the exact date, it appears that during Mr. Bird's ten-

---

Several jurisdictions have concluded that there is no such duty by the life tenant, unless the deed or will creating the life estate imposes a duty. These states hold that a life tenant and remainderman can each insure their own interest, and neither has any claim to the proceeds of the other's policy. *See, e.g., Harrison v. Pepper,* 166 Mass. 288, 289, 44 N.E. 222, 223 (1896) (A "life tenant is not bound to keep the premises insured for the benefit of the remainder-man."); *Bennett v. Featherstone,* 110 Tenn. 27, 71 S.W. 589 (1902); *Kincheloe v. Gibson's Executrix,* 115 Va. 119, 78 S.E. 603 (1913); *Blanchard v. Kingston,* 222 Mich. 631, 193 N.W. 241 (1923); *Thompson v. Gearheart,* 137 Va. 427, 119 S.E. 67 (1923); *Richardson v. McCloskey,* 276 S.W. 680 (Tex. Com.App.1925), (reaffirmed in *Hill v. Hill,* 623 S.W.2d 779 (Tex.App.1981)); *Underwood v. Fortune,* 9 S.W.2d 845 (Mo.App.1928); *Bell v. Barefield,* 219 Ala. 319, 122 So. 318 (1929); *In re Gorman's Estate,* 321 Pa. 292, 184 A. 86 (1936); *Farmers' Mut. Fire & Lightning Ins. Co. of Andrew County v. Crowley,* 354 Mo. 649, 190 S.W.2d 250 (1945); *Jackson v. Jackson,* 211 Ark. 547, 201 S.W.2d 218 (1947); *Almeida v. Price,* 107 Cal.App.2d 148, 236 P.2d 823 (1951); *Lynch v. Johnson,* 196 Va. 516, 84 S.E.2d 419 (1954); *Honeyman v. Heins,* 131 Ill.App.2d 981, 268 N.E.2d 907 (1971); *Banaszak v. Banaszak,* 133 Wis.2d 358, 363, 395 N.W.2d 614, 616 (1986) ("While insurance is one means to finance rebuilding costs, it is not maintenance. Insurance is a means of risk allocation, and the life tenant may choose to risk having to finance rebuilding the structure from her own assets.").

Other jurisdictions have reached the opposite conclusion and require life tenants to insure the estate property. These jurisdictions have held a life estate is a quasi-trust, with the life tenant having a duty to preserve the estate for the benefit of the remainderman; therefore, a life tenant has a duty to not only make repairs and improvements, but pay taxes on insurance on the property. *See, Clyburn v. Reynolds,* 31 S.C. 91, 9 S.E. 973 (1889); *Green v. Green,* 50 S.C. 514, 533, 27 S.E. 952, 958 (1897) ("[A] life tenant holds the relation of an implied or *quasi* trustee

to the remaindermen, and that any proceeds of a fire policy are subject to the laws regulating trusts."); *Sampson v. Grogan,* 21 R.I. 174, 42 A. 712 (1899); *Clark v. Leverett,* 159 Ga. 487, 126 S.E. 258 (1924); *Pool v. Pool,* 214 Ky. 267, 270, 283 S.W. 111, 112 (1926) ("[I]t is the duty of the life tenant to pay taxes and insurance and to maintain the property in a reasonable condition....."); *Thomas v. Thomas' Guardian,* 244 Ky. 724, 51 S.W.2d 949 (1932) (*overruled in part, Gaugh v. Gatewood,* 380 S.W.2d 84 (Ky.1964)); *Crook v. Hartford Fire Ins. Co.,* 175 S.C. 42, 178 S.E. 254 (1935); *Fitterling v. Johnson County Mut. Fire Ins. Co.,* 232 Mo.App. 805, 112 S.W.2d 347 (1938) (a life tenant is a trustee for the remaindermen); *Crisp County Lumber Co. v. Bridges,* 187 Ga. 484, 200 S.E. 777, 778 (1939) ("[T]he relation of the life tenant to the remainderman has been held to be, to a certain extent, a fiduciary one, and termed an implied or quasi trusteeship."); *In re John's Will,* 75 N.Y.S.2d 693, 696 (1947) ("The law is well settled that in the absence of a contrary direction in the will, the life tenant of real property must pay taxes, insurance and ordinary repairs thereon."); *Commercial Nat. Bank & Trust Co. of N.Y. v. Erwin,* 277 A.D. 378, 100 N.Y.S.2d 200, 205 (1950) ("The usual rule of construction is that a life tenant is obligated to pay for ordinary repairs, insurance, taxes and other carrying charges."); *In re Rosenblum's Will,* 132 N.Y.S.2d 604, 607 (1954); *Coleman v. Banks,* 349 S.W.2d 737, 741 (Tex.Civ.App.1961) ("[T]he life tenant, and not the remainderman, must bear the expenses of the care and preservation of the property, including insurance premiums, taxes, etc."), *holding questioned in Hill v. Hill,* 623 S.W.2d 779 (Tex.App. 1981); *Adams v. Adams,* 371 S.W.2d 637, 638 (Ky.1963) ("[T]he life tenant is bound to pay taxes, insurance, repairs and improvements and cannot charge them against the remaindermen." (citations omitted)).

We note that the appellant never insured his own interest in the property. The appellant's zeal regarding insurance only developed after the property was destroyed by fire.

ure as committee the appellant visited Highwood House. The appellant again found significant deterioration, finding bricks had fallen off a chimney and cut holes in the metal roof. He testified he repaired the holes to minimize damage to the house that would "obviously further deteriorate the house."

The appellant alleges that appellee Steiner's failure to make basic repairs to Highwood House and its contents between 1981 and 1986 constitutes waste under West Virginia law. The appellee argues that the appellant's claims, if any, are barred by the statute of limitation because the appellant waited nearly six years to initiate this action for waste. We agree with the appellee.

■ There are four steps to determining if a claim is barred by a statute of limitation. The first step in analyzing any statute of limitation question is to determine the applicable statute. Waste is a property damage tort consisting of an injury to the freehold by one rightfully in possession of land.[15] *Cecil v. Clark,* 49 W.Va. 459, 470, 39 S.E. 202, 206 (1901). A plaintiff need not be in possession of the land to initiate action. The action is "not one to recover damages for injury to the possession of the land ... [but for] permanent injury done to the freehold...." *Crowder v. Fordyce Lumber Co.,* 93 Ark. 392, 394, 125 S.W. 417, 418 (1910).

■ A life tenant owes a duty to a remainderman not to commit either voluntary or permissive waste. Waste is "any permanent or lasting injury done or permitted to be done by the holder of the particular estate to lands, houses, or other corporeal hereditaments, to the prejudice of the heir or

of him in remainder or reversion." *Gwinn v. Rogers,* 92 W.Va. 533, 540, 115 S.E. 428, 430 (1922). "Waste, injury to the freehold by a tenant for life or years, is actionable at common law, whether it result from affirmative wrongful acts or mere omission to perform duty." *Talbott v. Southern Oil Co.,* 60 W.Va. 423, 427, 55 S.E. 1009, 1011 (1906).[16] The term "waste" implies neglect or misconduct resulting in material damage to or loss of property, but does not include ordinary depreciation of property due to age and normal use over a comparatively short period of time. *Moore v. Phillips,* 6 Kan.App.2d 94, 97, 627 P.2d 831, 834 (1981).

■ "Voluntary" or "commissive" waste involves the commission of the deliberate, willful or voluntary destruction or carrying away of something attached to the freehold. *See, e.g., Gwinn v. Rogers, supra* (tenant not liable to landlord for holes dug for tent posts and trampled grass in striking miners' camp, as it is not a permanent injury rising to the level of waste); *Hardman v. Brown,* 77 W.Va. 478, 88 S.E. 1016 (1916) (co-tenant liable to other co-tenant for wantonly removing timber); *Cecil v. Clark, supra,* (co-tenant liable to other co-tenants for mining of coal); *Bettman v. Harness,* 42 W.Va. 433, 26 S.E. 271 (1896) (landlord may obtain injunction against tenant for removing oil and gas, if irreparable harm and title to land by landlord is established); *Rogers v. Coal River Boom & Driving Co.,* 41 W.Va. 593, 23 S.E. 919 (1896) (landlord stated claim against tenant for waste, when tenant built logging boom in river which diverted the water flow, thereby damaging landlord's soil); *Koen v. Bartlett,* 41 W.Va. 559, 23 S.E. 664 (1895) (it is not waste for life tenant to operate mines

---

**15.** Conversely, trespassing is an injury to the freehold by a stranger to the land. "This marks the distinction between waste and trespass." *Cecil v. Clark,* 49 W.Va. 459, 470, 39 S.E. 202, 206 (1901).

**16.** Injunctive relief is also available to restrain waste that is causing irremediable injury, an injury destructive to either the substance of the inheritance or that which gives it its chief value. *Greathouse v. Greathouse,* 46 W.Va. 21, 22, 32 S.E. 994, 995 (1899). We acknowledged the difficulty in defining irreparable injury in *Bettman v. Harness,* 42 W.Va. 433, 437, 26 S.E. 271, 272 (1896), when we stated:

What is irreparable injury? It is impossible to define it inflexibly. Rights of property and its uses change so; so many new rights of property with new uses arise as time goes on.... The word "irreparable" means that which cannot be repaired, restored, or adequately compensated for in money, or where the compensation cannot be safely measured. The courts have generally regarded as irreparable injuries the digging into mines of coal, iron, lead, and precious metals, and, as such injuries subtract from the very substance of the estate, and tend to its ultimate destruction, equity is said to be prompt to restrain them.

or oil and gas wells existing when life estate created); *McDodrill v. Pardee & Curtin Lumber Co.,* 40 W.Va. 564, 21 S.E. 878 (1895), *overruled on other grounds, Ritz v. Kingdon,* 139 W.Va. 189, 79 S.E.2d 123 (1953) (Plaintiffs, owners of land subject to a life estate, entitled to damages for waste or trespass for timber cut by defendant; amount of recovery dependent upon whether defendant was a co-tenant or stranger); *Williamson v. Jones,* 39 W.Va. 231, 19 S.E. 436 (1894) (petroleum and mineral oil are as much a part of the realty as timber, coal, iron ore, or salt water; removal by a life tenant constitutes waste); *Dunlap v. Hedges,* 35 W.Va. 287, 13 S.E. 656 (1891) (because insolvent mortgagor of property was cultivating land in a "wasteful and destructive" manner, holder of deed of trust was entitled to appointment of receiver to manage property); *University v. Tucker,* 31 W.Va. 621, 8 S.E. 410 (1888) (contingent remainderman entitled to injunction against waste caused by life tenant taking clay from the soil to use in manufacturing bricks); *Core v. Bell,* 20 W.Va. 169 (1882) (seller of land on a purchase contract may enjoin buyer from cutting timber or committing other waste, if such cutting is calculated to diminish the value of the land so that the land will not be sufficient to pay the unpaid purchase money); *Frank & Co. v. Brunnemann,* 8 W.Va. 462 (1875) (when a tenant is, by the terms of a lease, restricted to a particular use of the land a court may enjoin the tenant from other land uses such as cutting timber).

■ "Permissive waste" is the failure of the tenant, under the circumstances, to exercise the ordinary care of a prudent man for the preservation and protection of the estate. *Moore v. Phillips,* 6 Kan.App.2d at 97, 627 P.2d at 834; *Fisher's Executor v. Haney,* 180 Ky. 257, 259, 202 S.W. 495, 496 (1918). *See, e.g., Greathouse v. Greathouse,* 46 W.Va. 21, 32 S.E. 994 (1899) (widow with dower interest not liable to reversioner for natural wear and tear damages totaling less than $35, including allowing property to grow up in briars, allowing buildings and fencing to decay, and cutting a tree worth $15); *Dunlap v. Hedges, supra,* (because insolvent mortgagor of property "suffer[ed] said real estate to deteriorate in value by allowing the fences to go down," holder of deed of trust was entitled to appointment of receiver to manage property).

■ It appears that the appellant is alleging the appellees allowed permissive waste, an injury to property, to occur to Highwood House. Accordingly, the applicable statute of limitation in this case is found in *W.Va.Code,* 55–2–12 [1959] [17] which requires that an action for damage to property be brought within two years of the date the action accrued.

■ The second step in evaluating a statute of limitation question is to establish when the requisite elements of the alleged tort occurred, such that the cause of action "accrued." In this case, assuming *arguendo* that appellee Steiner owed Emily Keesecker a duty to faithfully manage her life estate property in West Virginia, and a duty to not commit waste to the appellant's remainder interest in the property, the latest possible breach of that duty would have occurred in 1986 when he relinquished his committeeship to appellee Bird. Accordingly, any cause of action against appellee Steiner accrued in 1986, and any lawsuit for property damage would have had to have been filed by 1988.

■ The next step is to determine whether the plaintiff is entitled to the benefit of the ameliorative effects of the discovery rule. Under the "discovery rule," the statute of limitations is tolled until a claimant knows or by the exercise of reasonable diligence should know of his claim. Syllabus Point 1, in part, *Cart v. Marcum,* 188 W.Va. 241, 423 S.E.2d 644 (1992). "The 'discovery rule' is generally applicable to all torts, unless there is a clear statutory prohibition of its application." Syllabus Point 2, *Id.*

■ In Syllabus Point 4 of *Gaither v. City Hospital, Inc.,* 199 W.Va. 706, 487 S.E.2d 901 (1997), we set forth the test which

---

17. *W.Va.Code,* 55–2–12 [1959], states:
 Every personal action for which no limitation is otherwise prescribed shall be brought: (a) Within two years next after the right to bring the same shall have accrued, if it be for damage to property....

circuit courts must use to determine the applicability of the discovery rule:

> In tort actions, unless there is a clear statutory prohibition to its application, under the discovery rule the statute of limitations begins to run when the plaintiff knows, or by the exercise of reasonable diligence, should know (1) that the plaintiff has been injured, (2) the identity of the entity who owed the plaintiff a duty to act with due care, and who may have engaged in conduct that breached that duty, and (3) that the conduct of that entity has a causal relation to the injury.

We stated that "[t]his rule tolls the statute of limitations until a plaintiff, acting as a reasonable, diligent person, discovers the essential elements of a possible cause of action, that is, discovers duty, breach, causation and injury." 199 W.Va. at 714, 487 S.E.2d at 909.

■ Applying *Gaither* to the case at hand, it is clear that the appellant cannot benefit from the discovery rule. The appellant testified that he knew as far back as 1975 that the property was deteriorating, and that permanent damage was occurring to his remainder interest in the property throughout appellee Steiner's tenure as committee. Second, the appellant knew that Mr. Steiner was acting as his step-mother's committee, and knew that he may have been failing to properly care for Emily Keesecker's life estate property. The appellant also knew that Mr. Steiner had relinquished his duties in 1986 and moved on, thereby ending any day-by-day breach of duty. Lastly, the appellant knew by 1986 that any breach of duty by the appellee was causing the alleged damage to the appellant's property interest. Hence, in 1986 or shortly thereafter, the appellant knew all of the elements of a possible cause of action—but failed to take any action. The appellant knew he that had an injury; knew that Mr. Steiner owed the appellant a duty of care, and knew that Mr. Steiner may have breached that duty; and knew that the potential breach was a cause of the injury.

Therefore, the appellant is not entitled to the protection of the discovery rule.

■ The last step in the statute of limitation analysis is to determine if the limitation period is tolled by some misconduct of the defendant. In *Cart v. Marcum, supra,* we recognized that in some circumstances causal relationships are so well established that we cannot excuse a plaintiff who pleads ignorance. In those instances where a cause of action should be patently obvious (such as in the case under consideration), the plaintiff cannot claim ignorance. The only way a plaintiff can toll the statute of limitation in such circumstances is to make "a strong showing ... that some action by the defendant prevented the plaintiff from knowing of the wrong at the time of the injury." Syllabus Point 3, *Cart, supra.* Our review of the record shows no competent evidence by the appellant that appellee Steiner did anything to hide his actions from the appellant.

Accordingly, we hold that the circuit court correctly ruled that any causes of action which the appellant may have had against appellee Steiner were barred by the statute of limitation.[18]

## IV

### *Conclusion*

The circuit court's August 18, 1995 order as to appellee Steiner is affirmed. The circuit court's August 18, 1995 order as to appellee Bird is reversed, and the case is remanded for proceedings consistent with this opinion.

Affirmed in part, reversed in part, and remanded.

---

18. We note, however, that the circuit court's order regarding appellee Steiner contains the same inadequacies as the order concerning appellee Bird. While the order is marginally more specific than the order concerning the claims against appellee Bird, we still believe the order fails to provide meaningful findings as required by *Fayette County National Bank, supra.* Nevertheless, because the order regarding appellee Steiner is clearly correct, it is affirmed.