632 S.E.2d 307

**Kimberly MERRILL and Teresa Mayfield, Plaintiffs Below, Appellants,**

v.

**WEST VIRGINIA DEPARTMENT OF HEALTH AND HUMAN RESOURCES, Defendant Below, Appellee.**

No. 32856.

Supreme Court of Appeals of West Virginia.

Submitted Feb. 15, 2006.

Decided May 12, 2006.

Margaret L. Workman, Charleston, Attorney for the Appellants.

Charles R. Bailey, Billie Jo Streyle, Bailey & Wyant, P.L.L.C., Charleston, Attorneys for the Appellee.

PER CURIAM:

Kimberly Merrill and Teresa Mayfield (hereinafter collectively referred to as "Kimberly and Teresa"), plaintiffs below and appellants herein, appeal an order of the Circuit Court of Kanawha County granting summary judgment in favor of the defendant below and appellee, the West Virginia Department of Health and Human Resources (hereinafter referred to as "DHHR").[1] Kimberly and Teresa have asserted various claims against DHHR arising from the services, or lack thereof, provided to them during their infancy by DHHR in relation to sexual abuse they suffered at the hands of their father. The Circuit Court of Kanawha County granted summary judgment based, in part, upon its conclusion that the discovery rule did not operate to toll the running

---

**1.** During the period of time when the events complained of in this case occurred, this agency was known as the State Department of Welfare. For ease of reference, however, we will refer to the agency as DHHR.

of the statute of limitations in this case. We agree, and therefore affirm the circuit court's order.

## I.

## FACTUAL AND PROCEDURAL HISTORY

This case involves the tragic history of two sisters who, in their childhood and youth, endured years of sexual abuse by their father, Albert Kirchmar. Kimberly Merrill (hereinafter referred to as "Kimberly") is the older of the two sisters. Kimberly's abuse was first reported to DHHR in January 1978, when DHHR received a report that her father had forced her to pose for a nude or semi-nude photograph. She was then twelve years old. Kimberly was not removed from the home by DHHR until July 24, 1982, following a subsequent report of sexual abuse.[2] Kimberly remained out of the home until after her eighteenth birthday.

During the four-and-a-half years between the initial report of abuse and Kimberly's removal from the home, she endured regular sexual abuse from her father.[3] Also during that period, her father moved temporarily out of the house, he admitted himself to a psychiatric hospital, her mother filed for divorce, her parents reconciled, and her family received counseling services. There was apparently no attempt on the part of DHHR during this time to privately interview Kimberly's younger sister Teresa to ascertain whether she was also being subjected to sexual abuse at the hands of her father.

The abuse of Teresa Mayfield (hereinafter referred to as "Teresa") was first reported to DHHR in June 1984, when it received a referral alleging that Teresa was being sexually abused by her father. In accordance with an agreed order consented to by Teresa's parents and their counsel, Teresa's Guardian ad Litem and DHHR, Teresa was removed from the home by DHHR and placed in foster care for a period of twelve months in August 1984. At the end of the twelve-month period, a counselor and psychologist who had been providing services to the family recommended that Teresa be returned to the custody of her family and that counseling be continued for six months. Accordingly, physical custody of Teresa was returned to her parents in August 1985, while DHHR maintained legal custody. At a review hearing in March 1986, the presiding circuit court found that the Kirchmars had engaged in regular counseling and there was no recurrence of the initial abuses; therefore, the court returned legal custody of Teresa to her parents.[4] After Teresa's return to her parents' home in 1985, she did not immediately disclose further abuse to DHHR; however, she later disclosed that her father resumed his sexual abuse of her. Teresa attempted to commit suicide on two occasions between the time she was returned to the custody of her parents and her eighteenth birthday. During her hospitalization for her first attempted suicide, she reported to her social worker that "nothing had changed" at home. While she was hospitalized following her second suicide attempt, she celebrated her eighteenth birthday and her DHHR file was closed.

The instant lawsuit was filed in the Circuit Court of Kanawha County on April 1, 2002, approximately one month prior to Kimberly's thirty-seventh birthday. Teresa was thirty-

2. We note that the circuit court judge who presided over the child abuse hearings involving Kimberly was the Honorable Larry V. Starcher, who now serves as a Justice on this Court. At the time he rendered his rulings regarding Kimberly, Justice Starcher had presided over numerous child abuse and neglect cases and thus could rely upon his extensive experience in this field along with the evidence presented for his consideration in issuing his decisions in this matter.

3. Between the time of the initial report of abuse and the report of abuse that ultimately lead to Kimberly's removal from the home, Kimberly did not fully disclose to any DHHR representatives the full extent of the abuse she endured. She points out, however, that during that time, DHHR never interviewed her or her younger sister Teresa outside of the presence of their abusive father.

4. Hearings related to Teresa were presided over by then Judge and now Justice Larry V. Starcher, as well Judge Robert B. Stone. Like Justice Starcher, see supra note 2 for comments regarding Justice Larry V. Starcher, when making his decisions regarding proper placement for Teresa, Judge Stone had at his disposal years of experience in child abuse and neglect cases.

three at the time the suit was filed.[5] An amended complaint was later filed on November 14, 2002. The amended complaint alleged (1) negligence by DHHR in returning the girls to their parents' home and/or failing to remove them from the home, being a breach of their statutory and common law duty to protect the girls; (2) a violation of the girls' substantive due process rights by virtue of DHHR's failure to protect them from the harm imposed by their father; (3) a denial of equal protection by virtue of DHHR's failure to protect them; (4) a denial of the girls' due process rights by virtue of DHHR's failure to protect them; (5) a breach of fiduciary duty; and (6) a violation of the girls' right to affirmative protection from harm.[6] The complaint further alleged that DHHR had fraudulently concealed material facts regarding its knowledge of the sexual misconduct of Albert Kirchmar.

On November 7, 2003, DHHR filed a motion for summary judgment claiming, *inter alia*, that the case was barred by the statute of limitations.[7] By order entered September 27, 2004, the circuit court granted summary judgment in favor of DHHR based, in part, on its conclusion that the statute of limitations for Kimberly's and Teresa's claims were not tolled by operation of the discovery rule. This appeal followed.[8] Based upon our review of the record, the briefs submitted on appeal, and the pertinent authorities, and after hearing oral arguments, we affirm the circuit court's order granting summary judgment in favor of DHHR.

## II.

### STANDARD OF REVIEW

This case is on appeal from an order of the circuit court granting summary judgment. "A circuit court's entry of summary judgment is reviewed *de novo*." Syl. pt. 1, *Painter v. Peavy*, 192 W.Va. 189, 451 S.E.2d 755 (1994). In conducting our de novo review, we apply the same standard for granting summary judgment that is applied by the circuit court. Under that standard,

"'[a] motion for summary judgment should be granted only when it is clear that there is no genuine issue of fact to be tried and inquiry concerning the facts is not desirable to clarify the application of the law.' Syllabus Point 3, *Aetna Casualty & Surety Co. v. Federal Insurance Co. of New York*, 148 W.Va. 160, 133 S.E.2d 770 (1963)." Syllabus Point 1, *Andrick v. Town of Buckhannon*, 187 W.Va. 706, 421 S.E.2d 247 (1992).

Syl. pt. 2, *Painter*. In other words,

[s]ummary judgment is appropriate where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, such as where the nonmoving party has failed to make a sufficient showing on an essential element of the case that it has the burden to prove.

Syl. pt. 4, *Painter*. Finally, we note that "[t]he circuit court's function at the summary judgment stage is not to weigh the evidence and determine the truth of the matter, but is to determine whether there is a genuine issue for trial." Syl. pt. 3, *Painter*.

## III.

### DISCUSSION

The conduct of DHHR that forms the basis for Kimberly's and Teresa's personal injury claims in this case occurred between 1978 and 1987. Pursuant to W. Va.Code § 55–2–12 (1959) (Repl.Vol.2000), "[e]very personal action for which no limitation is otherwise prescribed shall be brought: ... (b) within two years next after the right to bring the

---

5. Kimberly turned eighteen on May 3, 1983. Teresa turned eighteen on March 11, 1987.

6. For purposes of resolving the dispositive issue raised in this appeal, we assume, without deciding, that the various theories for liability asserted in the amended complaint present actionable claims.

7. A second motion for summary judgment was filed on June 14, 2004. We need not address the

grounds for summary judgment asserted in that motion, however, as this case is resolved by the first summary judgment motion.

8. Kimberly and Teresa assert several assignments of error in this appeal. Because the discovery rule issue is dispositive of this case, we need not address the other issues they have raised.

same shall have accrued if it be for damages for personal injuries ...." However, Kimberly and Teresa were infants during the time of their alleged injuries. Due to their infancy, the statute of limitations did not begin to run on their claims until they reached the age of majority:

> If any person to whom the right accrues to bring any such personal action, suit or scire facias, or any such bill to repeal a grant, shall be, at the time the same accrues, *an infant* or insane, *the same may be brought within the like number of years after his becoming of full age* or sane that is allowed to a person having no such impediment to bring the same after the right accrues, or after such acknowledgment as is mentioned in section eight of this article, except that it shall in no case be brought after twenty years from the time when the right accrues.

W. Va.Code § 55-2-15 (1923) (Repl.Vol.2000) (emphasis added). Kimberly reached the age of majority on May 3, 1983, while Teresa turned eighteen on March 11, 1987. Accordingly, unless the statute of limitations is extended by operation of the discovery rule, their claims became time barred after May 3, 1985, and March 11, 1989 respectively.

■ "Generally, a cause of action accrues (i.e., the statute of limitations begins to run) when a tort occurs; under the 'discovery rule,' the statute of limitations is tolled until a claimant knows or by reasonable diligence should know of his claim." Syl. pt. 1, *Cart v. Marcum*, 188 W.Va. 241, 423 S.E.2d 644 (1992).[9] In West Virginia, two versions of the discovery rule have been developed:

> A studious observer will note that this Court stated one form of the discovery rule in *Cart v. Marcum*, and then stated a different, more lenient form of the discovery rule in *Gaither v. City Hospital* [*Inc.,* 199 W.Va. 706, 487 S.E.2d 901 (1997) ] ....
>
> .... [D]ecisions such as *Keesecker* [ *v. Bird,* 200 W.Va. 667, 490 S.E.2d 754 (1997) ] make clear that ... *Cart v. Marcum* governs only those cases where the plaintiff is compelled to allege some deed

by the defendant concealed the cause of action from the plaintiff.

*Miller v. Monongalia County Bd. of Educ.,* 210 W.Va. 147, 153 n. 3, 556 S.E.2d 427, 433 n. 3 (2001). In determining whether the circuit court correctly found that the evidence did not satisfy the elements of the discovery rule in the instant case, we will address each version of the rule, beginning with the version of the rule announced in *Gaither.*

### A. Discovery Rule Under Gaither v. City Hospital

■ In Syllabus point 4 of *Gaither v. City Hospital, Inc.,* this Court held that

> [i]n tort actions, unless there is a clear statutory prohibition to its application, under the discovery rule the statute of limitations begins to run when the plaintiff knows, or by the exercise of reasonable diligence, should know (1) that the plaintiff has been injured, (2) the identity of the entity who owed the plaintiff a duty to act with due care, and who may have engaged in conduct that breached that duty, and (3) that the conduct of that entity has a causal relation to the injury.

199 W.Va. 706, 487 S.E.2d 901 (1997). Considering each of these criteria, we find no error in the circuit court's grant of summary judgment in favor of DHHR under a *Gaither* analysis.

The first of the three elements necessary to trigger the running of the statute of limitations under *Gaither* is that the plaintiffs either know, or by the exercise of reasonable diligence, should know that they have been injured. In their response to DHHR's summary judgment motion and in their brief to this Court, Kimberly and Teresa indicate that their injury was DHHR's failure to protect them by timely removing them from their father's home. Notably, however, "failure to protect" does not describe an injury. Rather, it relates to the duty of DHHR that was claimed to have been breached in this case. Based upon the totality of the argu-

---

9. "The 'discovery rule' is generally applicable to all torts, unless there is a clear statutory prohibition of its application." Syl. pt. 2, *Cart v. Mar-* *cum,* 188 W.Va. 241, 423 S.E.2d 644. There is no statutory prohibition to applying the discovery rule in the instant case.

ments set forth by Kimberly and Teresa, we surmise that the injury of which they complain is their continued exposure to sexual abuse at the hands of their father that occurred subsequent to the point in time when, they contend, DHHR should have removed them from the home, and the physical and psychological injuries that resulted therefrom.

We find no material question of fact exists in this case with respect to Kimberly's and Teresa's knowledge of their injury. In separate affidavits attached to the plaintiffs' response to DHHR's motion for summary judgment, both Kimberly and Teresa made the statement "I was sexually abused by my father, Albert Kirchmar, from the earliest age that I can remember." They both further stated, "[d]uring my childhood, I reported the abuse on a number of occasions to people in my life who I felt were figures of authority, including the representatives of the agency that is now called the West Virginia Department of Health and Human Resources." Without question, then, both Kimberly and Teresa have demonstrated that they knew they were being sexually abused by their father, and that the sexual abuse continued after they reported the same to individuals they considered to be "figures of authority." Moreover, each woman further explained that her resulting physical and emotional injuries had existed throughout her adulthood: "throughout my adulthood, I suffered extreme physical and emotional pain as a result of this continued sexual abuse. I have had a difficult time trying to form positive trusting relationships, very low self-esteem, aggravated difficulty in terms of education and career, and a great deal of personal anxiety." Teresa alone made the additional comment that she had "attempted suicide on two occasions." Based upon these statements in their affidavits, there is simply no genuine issue of material fact with respect to whether Kimberly and Teresa knew of their injury when they reached adulthood, as they have demonstrated plainly that they have been aware of their injuries their entire adult lives.

■ The next factor that must be present to trigger the running of the statute of limi-

tations under *Gaither* is that the plaintiff knew or by the exercise of reasonable diligence should have known "the identity of the entity who owed the plaintiff a duty to act with due care, and who may have engaged in conduct that breached that duty." With respect to this factor, Kimberly and Teresa argue that, prior to their therapy, they did not know that DHHR owed them a duty of protection or that DHHR had breached that duty. This argument, however, misapprehends the second factor of *Gaither*. The second *Gaither* factor is the *identity* of the wrongdoer, not knowledge of the duty owed. In fact, it has been established that a lack of knowledge of a legal duty owed will not toll the statute of limitations. *See Hays v. City & County of Honolulu*, 81 Hawai'i 391, 399, 917 P.2d 718, 726 (1996) ("[P]laintiff's lack of knowledge regarding a legal duty, the breach of which may have caused the plaintiff injury, will not justify application of the discovery rule."). We find this principle particularly persuasive where the alleged tortfeasor is a public agency whose duties are established by statute. *See, e.g., Ormiston v. Nelson*, 117 F.3d 69, 72 n. 5 (2d Cir.1997) ("Mere ignorance of the law is, of course, insufficient to delay the accrual of the statute of limitations."); *Miller v. Pacific Shore Funding*, 224 F.Supp.2d 977, 986 (D.Md.2002) ("The discovery rule, in other words, applies to discovery of facts, not to discovery of law. Knowledge of the law is presumed."); *Bluitt v. Houston Indep. Sch. Dist.*, 236 F.Supp.2d 703, 718 (S.D.Tex.2002) ("It is well established that mere ignorance of the law for any reason, including lack of counsel, does not toll a statute of limitations."); *Orlikow v. United States*, 682 F.Supp. 77, 84 (D.D.C. 1988) ("In *United States v. Kubrick*, 444 U.S. 111, 100 S.Ct. 352, 62 L.Ed.2d 259 (1979), a medical malpractice case, the Supreme Court held that the plaintiff's ignorance of his legal rights did not constitute the 'blameless ignorance' for which tolling is applied. Neither does ignorance of the law ordinarily toll the statute of limitations." (additional citation omitted)); *Greene v. Team Props., Inc.*, 247 Ga.App. 544, 546, 544 S.E.2d 726, 728 (Ga.Ct. App.2001) ("[I]gnorance of the law offers no legal excuse for failing to file an action within the applicable statute of limitation."), *over-*

*ruled on other grounds by Tiismann v. Linda Martin Homes Corp.*, 279 Ga. 137, 610 S.E.2d 68 (2005); *People v. Lander*, 215 Ill.2d 577, 588, 831 N.E.2d 596, 603, 294 Ill.Dec. 646, 653 (2005) ("It is well settled that all citizens are charged with knowledge of the law. . . . Ignorance of the law or legal rights will not excuse a delay in filing a lawsuit." (citations omitted)); *Moreland v. Aetna U.S. Healthcare, Inc.*, 152 Md.App. 288, 297–98, 831 A.2d 1091,1096 (2003) ("The discovery rule, in other words, applies to discovery of facts, not to discovery of law. Knowledge of the law is presumed. . . . Ignorance of the rights it grants and protects does not toll the statute of limitations." (internal citations and quotation omitted)); *Lynch v. Dial Fin. Co. of Ohio No. 1, Inc.*, 101 Ohio App.3d 742, 747, 656 N.E.2d 714, 718 (1995) ("Even if, arguendo, the discovery rule did apply to statutory claims, it would apply to the discovery of facts, not to the discovery of what the law requires.").

In order to toll the statute under the discovery rule as announced in *Gaither*, it is not the legal duty owed that must have escaped knowledge by Kimberly and Teresa, but rather the *identity* of the tortfeasor. In their affidavits that were attached to Kimberly and Teresa's response to DHHR's first motion for summary judgment, both women made identical statements asserting "I did not know what entity DHHR representatives were with when I was a child . . . ." However, a review of their deposition testimony demonstrates that Kimberly and Teresa have long known the identity of those who they contend caused them harm. In this regard, when Kimberly was asked during her deposition about her recollection of a home visit by

Kaaren Ford, a social service worker for DHHR, Kimberly stated:

I have a recollection of someone coming to the home, to the trailer, and all of us sitting around a table, a kitchen table, my mother and my father, my sister and my brother, myself and this other person.

I knew that she was someone of an agency or something. . . .

Kimberly additionally testified that she had some, though incomplete, recollections of various meetings at which a social worker identified as Ms. Randolph was present.[10] Furthermore, when Kimberly was asked if she had any reason to dispute the accuracy of a note prepared by Ms. Randolph regarding portions of a meeting Kimberly was unable to recall, she responded that "I do have reason, because *I felt like I was let down then*, and I don't know if I trust everything in these notes." (Emphasis added). This statement clearly indicates that Kimberly recalled the involvement of Ms. Randolph in 1982 and that, at that time, she felt that she had been "let down." She also remembered that there was a court proceeding where Ms. Randolph was present, and she remembered being placed in foster care.[11] Finally, however, and most significantly, Kimberly testified that in June of 1984, after she had reached the age of adulthood and learned that her sister Teresa was being sexually assaulted by their father, Kimberly called DHHR and reported her sister's abuse: [12]

Q. Before we begin, it's my understanding—and I'll show it to you out of my notebook here—on 6–18–84 there's a referral for Child Protective Services; and I think we've established that on 6–18–84, thereabouts, you actually called Health and

---

10. Kimberly testified to recollections she had of running away from home in 1982 and staying at the Youth Services Center. During Kimberly's stay at the Youth Services Center, there was a meeting with Kimberly, both of her parents, Ms. Randolph, and another individual who may have been employed by the Youth Services Center present. Kimberly stated that she recalled part of this meeting and also a meeting that occurred at home.

11. Kimberly stated that she recalled being placed in a foster care home after her father would not leave her alone during a short period of time that she lived with an aunt and uncle in Westover,

West Virginia. She also recalled being placed in the custody of an aunt and uncle in Pennsylvania for a period of one year.

12. To the extent that Kimberly's affidavit directly contradicts this deposition testimony, it may be viewed as a sham affidavit. *See Kiser v. Caudill*, 215 W.Va. 403, 409, 599 S.E.2d 826, 832 (2004) ("Basically, the 'sham affidavit' rule precludes a party from creating an issue of fact to prevent summary judgment by submitting an affidavit that directly contradicts previous deposition testimony of the affiant.").

Human Resources and reported that your sister was being sexually abused by your father. Your name is redacted, which is— but I believe we established you were the one more likely than not that made the call, correct?

A. Yes.

Q. Okay, so in June of 1984 you reported to the DHHR that your sister was being sexually abused, correct?

A. Correct.

Kimberly also stated that, after reporting her sister's abuse, she spoke with "different social workers" regarding her sister and her own prior sexual abuse.[13]

Teresa's testimony likewise established that it was Kimberly who had reported Teresa's abuse to DHHR:

Q. ... Do you recall your sister reporting to the DHHR that your father was sexually abusing you?

A. Yes, I remember

Teresa also testified that she remembered Brenda Morgan, a DHHR social worker assigned to her case, very well and recalled having lots of meetings with Ms. Morgan.[14]

The deposition testimony of Kimberly and Teresa clearly demonstrates that, sometime during the period when they and their family were involved with DHHR (which was prior to their reaching the age of majority), they became aware of DHHR and the identity of specific social workers who were assigned to them by DHHR. In particular, they were able to specifically identify Ms. Randolph and Ms. Morgan, and, after reaching age eighteen, Kimberly was able to contact DHHR to report that her sister was being abused. Accordingly, there is simply no genuine issue of material fact with respect to whether Kimberly and Teresa knew of the identity of the tortfeasor in this case, as they have demonstrated plainly that they have possessed this knowledge their entire adult lives.[15]

The third and final element of *Gaither* requires Kimberly and Teresa to establish that they neither knew nor by the exercise of reasonable diligence, should have known that the conduct of DHHR had a causal relation to their physical and emotional injuries. Kimberly and Teresa essentially argue that, prior to intensive therapy, they did not comprehend the causal connection between their injuries and the actions of DHHR during the time in which they were being sexually abused by their father.[16] However, the only evidence presented to the circuit court on this issue by Kimberly and Teresa was their

---

13. Kimberly specifically stated that she recalled having conversations about Teresa with Ms. Brenda Morgan, who was a DHHR employee. Kimberly's testimony also revealed that she knew her sister Teresa was placed in foster care for a period of one year.

14. To the extent that Teresa's affidavit directly contradicts this deposition testimony, it may be viewed as a sham affidavit. *See supra* note 12.

15. Assuming *arguendo* that Kimberly and Teresa did not associate DHHR with the social workers who were involved with them and their family, they concede in both their affidavits and their deposition testimony that they knew the identities of specific social workers. Having knowledge of the identity of the social workers placed upon them a duty to, upon reaching the age of majority, investigate who employed the social workers. *See, e.g., McCoy v. Miller*, 213 W.Va. 161, 165, 578 S.E.2d 355, 359 (2003) ("Where a plaintiff knows of his injury, and the facts surrounding that injury place him on notice of the possible breach of a duty of care, that plaintiff has an affirmative duty to further and fully investigate the facts surrounding that potential breach." (citation omitted)); *Vorholt v. One Valley Bank*, 201 W.Va. 480, 485, 498 S.E.2d 241, 246 (1997) ("This Court believes that the appel-

lant should reasonably have known of the existence of his claim long before May 1989, when he was notified by the appellee. The appellant knew of his father's death in 1970. At that time or any time thereafter, an inquiry into the nature of his father's estate would have disclosed the existence and the terms of the trust. The appellant would have immediately discovered that he was excluded as a beneficiary of the trust, and he could have asserted his claim in a timely manner. Because the appellant neglected to make such an inquiry, he cannot now benefit from the discovery rule.").

16. Kimberly and Teresa argue that their case is legally and factually similar to *Miller v. Monongalia County Board of Education*, 210 W.Va. 147, 556 S.E.2d 427. We disagree. The plaintiff in *Miller* alleged that

the Board had actual or constructive notice that McIntosh was a sexual predator who was engaging in inappropriate sexual conduct with female school children. She alleged that the Board had reasonable cause to suspect that, prior to becoming a victim herself, another child was being abused by McIntosh but the Board failed to report the abuse to the appropriate officials or to take any action to stop

respective affidavits. In this regard, Kimberly stated in her affidavit:

7. As adults, both my sister and I sought counseling and therapy for severe emotional problems, difficulty maintaining relationships and severe depression which we learned through therapy stemmed from the past physical, sexual and emotional abuse by my father.

8. The therapy helped me remember more fully the incidents of sexual assault by my father; and to discover the fact that the DHHR was involved.

9. During the therapy in early to mid–2000, I mentioned to my counselor, Melanie Rogers, that I had been in foster care. This triggered her to realize that the Department of Health and Human Resources had been involved, and she thought it would be helpful for me to review the DHHR records concerning my case.

. . . .

13. I did not discover until after I underwent therapy and reviewed the DHHR records on October 2, 2000 that the DHHR failed to protect my sister and I from my father and that this failure caused the damages we have suffered and continue to suffer. . . .

Teresa's affidavit contained paragraphs identical to paragraphs 7 and 8 of Kimberly's affidavit, and further stated:

> McIntosh. She also alleged that the Board fraudulently concealed material facts regarding its own involvement in and knowledge of the sexual misconduct of McIntosh in an effort to prevent the victims from instituting civil actions. We believe these allegations are sufficient to withstand the motion to dismiss based upon the statute of limitations.

210 W.Va. at 151, 556 S.E.2d at 431. Unlike *Miller*, there is no evidence in this case that DHHR attempted in any way to conceal its involvement in this case in order to prevent the institution of a civil action, or failed to report the abuse to proper officials.

17. Kimberly reached the age of eighteen on May 3, 1983; thus, unless tolled by application of the discovery rule, the statute of limitations expired on May 3, 1985.

18. Teresa reached the age of eighteen on March 11, 1987; thus, unless tolled by application of the discovery rule, the statute of limitations expired on March 11, 1989.

19. *See also Toth v. Board of Parks & Rec. Comm'rs*, 215 W.Va. 51, 56, 593 S.E.2d 576, 581

13. I did not discover until after I had a conversation with my sister Kimberly after she had reviewed the DHHR records on October 2, 2000 that the DHHR failed to protect my sister and I from my father and that this failure caused the damages we have suffered and continue to suffer. . . .

■ The record does not contain any corroborating affidavits from any counselors who treated Kimberly or Teresa, nor do Teresa and Kimberly direct our attention to any other evidence in the record supporting their allegations of the reasonableness of a delay of over seventeen years for Kimberly,[17] and more than thirteen years for Teresa,[18] in discovering the causal connection between their injuries and the actions of DHHR. This Court has repeatedly explained that "the party opposing summary judgment must satisfy the burden of proof by offering more than a mere 'scintilla of evidence,' and must produce evidence sufficient for a reasonable jury to find in a nonmoving party's favor." *Painter v. Peavy*, 192 W.Va. 189, 192–93, 451 S.E.2d 755, 758–59 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202, 214 (1986)).[19]

■ Moreover, we have explained that "self-serving assertions without factual sup-

(2003) (quoting *Painter v. Peavy*); *Mrotek v. Coal River Canoe Livery, Ltd.*, 214 W.Va. 490, 493, 590 S.E.2d 683, 686 (2003) (per curiam) (same); *Allstate Wrecker Serv. v. Kanawha County Sheriff's Dep't*, 212 W.Va. 226, 230–31, 569 S.E.2d 473, 477–78 (2002) (per curiam) ("It is well-settled that 'the nonmoving party must take the initiative and by affirmative evidence demonstrate that a genuine issue of fact exists.' *Painter*, 192 W.Va. at 192 n. 5, 451 S.E.2d at 758 n. 5. The quantity of evidence necessary to defeat a motion for summary judgment is 'more than a mere "scintilla of evidence." ' *Id.* at 192, 451 S.E.2d at 758."); *Harbaugh v. Coffinbarger*, 209 W.Va. 57, 62, 543 S.E.2d 338, 343 (2000) (per curiam) (quoting *Painter*); *Bowers v. Wurzburg*, 207 W.Va. 28, 41, 528 S.E.2d 475, 488 (1999) (quoting *Painter*); *Gooch v. West Virginia Dep't of Pub. Safety*, 195 W.Va. 357, 365, 465 S.E.2d 628, 636 (1995) ("To meet its burden [of responding to a properly supported motion for summary judgment], the nonmoving party must offer 'more than a mere "scintilla of evidence" and must produce evidence sufficient for a reasonable jury to find in a nonmoving party's favor.' " (quoting *Anderson v. Liberty Lobby*)).

port in the record will not defeat a motion for summary judgment." *Williams v. Precision Coil, Inc.,* 194 W.Va. 52, 61 n. 14, 459 S.E.2d 329, 338 n. 14 (1995). *See also Dunn v. Watson,* 211 W.Va. 418, 421, 566 S.E.2d 305, 308 (2002) (same, citation omitted); *Coleman v. Sopher,* 201 W.Va. 588, 612, 499 S.E.2d 592, 616 (1997) (same). Indeed, we have elaborated that

> The movant's burden is "only [to] point to the absence of evidence supporting the nonmoving party's case." *Latimer v. Smithkline & French Laboratories,* 919 F.2d 301, 303 (5th Cir.1990).... If the movant ... make[s] this showing, the nonmovant must go beyond the pleadings and contradict the showing by pointing to specific facts demonstrating a "trialworthy" issue. *To meet this burden, the nonmovant must identify specific facts in the record and articulate the precise manner in which that evidence supports its claims.* As to material facts on which the nonmovant will bear the burden at trial, the nonmovant must come forward with evidence which will be sufficient to enable it to survive a motion for directed verdict at trial. If the nonmoving party fails to meet this burden, the motion for summary judgment must be granted. *See Nebraska v. Wyoming,* 507 U.S. 584, 590, 113 S.Ct. 1689, 1694, 123 L.Ed.2d 317, 328 (1993); *Lujan v. National Wildlife Federation,* 497 U.S. 871, 884, 110 S.Ct. 3177, 3186, 111 L.Ed.2d 695, 713 (1990).

*Powderidge Unit Owners Ass'n v. Highland Props., Ltd.,* 196 W.Va. 692, 699, 474 S.E.2d

872, 879 (1996) (emphasis added). In this case, Kimberly and Teresa have utterly failed to provide any supporting affidavits to corroborate their self-serving statements, and have further failed to "identify specific facts in the record and articulate the precise manner in which that evidence supports [their] claims" of delay in discovering the causal connection between their injuries and DHHR's actions. *Id.* Accordingly, they have not established the existence of a genuine issue of material fact with respect to their knowledge of a causal connection between their injury and DHHR's actions.

■ Kimberly and Teresa have failed to establish the existence of a genuine question of material fact with respect to any of the factors set out in Syllabus point four of *Gaither.*[20] "Summary judgment is appropriate where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, such as where the nonmoving party has failed to make a sufficient showing on an essential element of the case that it has the burden to prove." Syl. pt. 4, *Painter.*[21] Because the statute of limitations was not tolled under *Gaither,* Kimberly and Teresa were required to bring their cases within two years of turning eighteen. Their claims were not filed within that period and, therefore, summary judgment was proper under a *Gaither* analysis.

### B. Discovery Rule Under Cart v. Marcum

■ We next examine the applicability to this case of the version of the discovery

---

**20.** Kimberly and Teresa argue that the question of when they knew, or by reasonable diligence should have known, of their claims was a question of fact for the jury. However, we have previously held that

> [t]he mere fact that a particular cause of action contains elements which typically raise a factual issue for jury determination does not automatically immunize the case from summary judgment. The plaintiff must still discharge his or her burden under West Virginia Rule of Civil Procedure 56(c) by demonstrating that a legitimate jury question, i.e. a genuine issue of material fact, is present.

Syl. pt. 1, *Jividen v. Law,* 194 W.Va. 705, 461 S.E.2d 451 (1995). Here, Kimberly and Teresa have failed to discharge their duty of establishing the presence of a genuine issue of material fact.

**21.** If Kimberly and Teresa had needed to conduct additional discovery in order to resist the motion for summary judgment, they could have tendered to the circuit court an affidavit stating their need for additional discovery under Rule 56(f) of the West Virginia Rules of Civil Procedure, which states:

> Should it appear from the affidavits of a party opposing the motion [for summary judgment] that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

There has been no representation to this Court that any Rule 56(f) motion was made to the circuit court, and we find none in the record.

rule announced in *Cart v. Marcum*, 188 W.Va. 241, 423 S.E.2d 644, which states:

> Mere ignorance of the existence of a cause of action or of the identity of the wrongdoer does not prevent the running of the statute of limitations; the "discovery rule" applies only when there is a strong showing by the plaintiff that some action by the defendant prevented the plaintiff from knowing of the wrong at the time of the injury.

Syl. pt. 3, *Cart.* Thus, under *Cart,* Kimberly and Teresa are required to make a strong showing that some action by DHHR prevented them from knowing of the wrong at the time of their injury. In *Miller v. Monongalia County Board of Education,* 210 W.Va. 147, 556 S.E.2d 427, this Court additionally held that

> Fraudulent concealment requires that the defendant commit some positive act tending to conceal the cause of action from the plaintiff, although any act or omission tending to suppress the truth is enough.

Syl. pt. 3, *id.*

■ Before this Court, Kimberly and Teresa argue that an omission on the part of DHHR prevented them from knowing of their claims. Specifically, Kimberly and Teresa contend that

> there was unrefuted evidence that the Appellants had difficulty in acquiring their records from the DHHR once they were requested and that, had such delay not occurred, the statute of limitations would have been preserved.... Even when the records were produced by DHHR, there is a substantial factual issue as to whether all their records were provided. The Petitioners [Kimberly and Teresa], in their affidavits submitted in opposition to the Motion for Summary Judgment both maintained that it was not until they sought the assistance of counsel that a process began which eventually provided them with copies of all of their records. Further, ... the Petitioners contend that they were entitled to full information about their case which was never provided them by any of

those who bore a fiduciary obligation to them.

The best that we are able to discern from this argument is that Kimberly and Teresa assert that if DHHR had not delayed in turning over the requested records, "the statute of limitations would have been preserved." This argument has no merit. It is undisputed that no records were requested from DHHR until sometime in the year 2000, long after the expiration of the statute of limitations. As our *Gaither* analysis above demonstrates, Kimberly and Teresa possessed knowledge of the critical facts necessary to bring their lawsuit at the time they each turned eighteen. Thus, any facts that may have been revealed in the requested DHHR records were irrelevant to tolling the statute of limitations.[22] Accordingly, the circuit court did not err in granting summary judgment.

## IV.

## CONCLUSION

For the reasons stated in the body of this opinion, the September 27, 2004, order of the Circuit Court of Kanawha County granting summary judgment in favor of DHHR is affirmed.

Affirmed.

ALBRIGHT, Justice, dissenting.

This case presents difficult, intertwined legal questions which the majority has addressed in an obtuse fashion through a per curiam opinion. As a result, the majority has succeeded only in confusing rather than squarely confronting and resolving the significant issues the case raises. The sad result is that the two sisters who are appellants are victims of yet another injustice. That impels me to write separately.

The ultimate conclusion of the majority, finding that the statute of limitations precludes Appellants' lawsuit, is grossly flawed because the majority failed to clearly examine the impact of the lower court's erroneous

---

22.  Assuming, for the sake of argument, that records were timely requested, the mere fact of some delay by DHHR in turning over the records does not, in and of itself, constitute fraudulent concealment.

ruling on qualified immunity on the statute of limitations issue. This flaw is compounded by the majority's fuzzy and confusing analysis of the discovery rule and merely marginal examination of the doctrine of fraudulent concealment.

A. Qualified Immunity

The first step in a fair analysis of this case begins with a consideration of qualified immunity. In their amended complaint, Appellants sought recovery from "the West Virginia Department of Health and Human Resources, a West Virginia state agency in an amount under and up to the limits of the State's liability insurance coverage." Rather than supplying the court below with information about the extent of insurance coverage available through the State's insurance contract, DHHR responded to the complaint by claiming immunity from liability under the common-law doctrine of qualified immunity, in reliance on this Court's discussion in *Parkulo v. West Virginia Board of Probation and Parole*, 199 W.Va. 161, 483 S.E.2d 507 (1996). The Statement of the Law section of the lower court's order reflects that the lower court's determination of the qualified immunity issue was based upon the following premise:

29. To sustain a viable claim against a state agency or its employees or officials acting within the scope of their authority sufficient to overcome the common law doctrine of qualified immunity, it must be established that the agency employee or official knowingly violated a clearly established law, or acted maliciously, fraudulently or oppressively. *Parkulo v. West Virginia Bd. of Probation*, 199 W.Va. 161, 177, 483 S.E.2d 507, 524 (1996).

Indeed, the Conclusions of Law portion of the order reflects application of this premise:

49. The Court finds as fact that the Plaintiffs have not presented any arguments and/or a scintilla of evidence rebutting DHHR's argument that it was entitled to qualified immunity. The Plaintiffs merely argued that DHHR had a special relationship with the Plaintiffs. The special relationship doctrine is an exception to the public duty doctrine.

50. DHHR did not argue the public duty doctrine as a defense, because it conceded that it had a special relationship with the Plaintiffs; therefore, the public duty doctrine was not a viable defense. (Emphasis added.)

\* \* \* \* \* \*

52. Based upon the fact the Plaintiffs failed to address DHHR's averment of qualified immunity and failed to present any evidence demonstrating DHHR knowingly violated a clearly established law, or acted maliciously, fraudulently or oppressively, this Court does hereby find that the Plaintiffs have failed to overcome the doctrine of qualified immunity; therefore, since there is no genuine issue of material fact, DHHR is entitled to summary judgment on all the claims involving an alleged duty, predicated upon the doctrine of qualified immunity.

Appellants appealed this lower court ruling, asserting that the *Parkulo* principles relied upon by the lower court were decided in the context of exposing employees and officers of State entities to personal liability for damages resulting from performance of their government jobs. As Appellants' suit is not based on personal liability of any DHHR employee but on the liability of the State agency, Appellants claimed that DHHR may be held liable under the special relationship exception to the public duty doctrine which was also discussed in *Parkulo*.

In *Parkulo*, the plaintiff appealed the grant of summary judgment against her for claims she had filed against the State's Division of Corrections and the Board of Probation and Parole. The trial court had granted summary judgment to both State entities by finding that the civil action was barred by the public duty doctrine in that the plaintiff failed to establish the special relationship exception to that doctrine. After a lengthy discussion based on reconciling the concepts of common-law governmental immunities, the public duty doctrine and the insurance exception to constitutional immunity, this Court concluded under the facts presented in *Parkulo* that the Board of Probation and Parole *may* be able to claim quasi-judicial immunity

and the West Virginia Division of Corrections *may* be able to claim the benefit of the public duty doctrine *depending* on what was determined on remand regarding whether or not the State's insurance contract provided coverage notwithstanding the availability of these defenses. Our precise holding in this regard is found in syllabus point six of *Parkulo*, as follows:

> Unless the applicable insurance policy otherwise expressly provides, a State agency or instrumentality, as an entity, is immune under common-law principles from tort liability in W. Va.Code § 29–12–5 actions for acts or omissions in the exercise of a legislative or judicial function and *for the exercise of an administrative function involving the determination of fundamental governmental policy.*

199 W.Va. at 163–64, 483 S.E.2d at 509–10 (emphasis added). Accordingly, the first step that a trial court must undertake when presented with the issue of qualified immunity involving a state entity is to determine whether the State's insurance policy expressly waives common-law immunity for tort liability. If such waiver does not exist, then the question before the court is whether the state entity was exercising a legislative or judicial function or an administrative function involving the determination of a fundamental governmental policy. Absent proof of any such functions, a state agency covered by insurance may be sued for damages up to the limit of the applicable insurance policy. *Pittsburgh Elevator Co. v. West Virginia Bd. of Regents,* 172 W.Va. 743, 310 S.E.2d 675 (1983).

The qualified immunity "test" applied by the lower court in the instant case was first adopted, as Appellants correctly note, as the sole syllabus point of *State v. Chase Securities, Inc.,* 188 W.Va. 356, 424 S.E.2d 591 (1992). As stated in *Chase Securities,*

> A public executive official who is acting within the scope of his authority and is not covered by the provisions of W. Va.Code, 29–12A–1, *et seq.*, is entitled to qualified immunity from personal liability for official acts if the involved conduct did not violate clearly established laws of which a reason-

able official would have known. There is no immunity for an executive official whose acts are fraudulent, malicious or otherwise oppressive.

We noted in *Parkulo* that this standard was thereafter extended to the actions of a State employed conservation officer, acting within the scope of his employment, in the case of *Clark v. Dunn,* 195 W.Va. 272, 465 S.E.2d 374 (1995). We also noted in *Parkulo,* that absent fraudulent, malicious or otherwise oppressive acts of the state employee or officer which might negate qualified immunity for the employee or officer, the agency for which the employee or officer worked ordinarily— but not always—enjoys qualified immunity co-terminus with, or of equal effect to, that enjoyed by the officer or employee. *See* 199 W.Va. 161, at 177–78, 483 S.E.2d 507, at 523–24 (discussing vicarious liability of the state under such circumstances). We said there, however, that the issue of whether the agency immunity would be as broad as that of its officer or employee would be determined on a case-by-case basis. Further into that discussion we quoted the following comment attached to *Restatement (Second) of Torts* § 895D:

> [D]uties or obligations may be placed on the government that are not imposed on the officer, and statutes sometimes make the government liable when its employees are immune.

*Restatement (Second) of Torts* § 895D, cmt. j, in part (1979).[1]

In the instant case, that portion of the final order granting summary judgment on the grounds of qualified immunity relates the lower court's conclusion that DHHR was entitled to qualified immunity because Appellants had failed to adduce even a scintilla of evidence that DHHR had violated any clearly established law. In so deciding, the court below disregarded statements of law embodied in our child welfare statute. The Legislature has expressly provided that the purpose of those statutes, embodied in Chapter 49 of the Code of West Virginia 1931, as amended, "is to provide a coordinated system of child welfare and juvenile justice for the children

---

1. *Restatement (Third) of Torts* was published in 2000 but does not touch upon this subject.

of this state." W.Va.Code § 49–1–1(a) (Repl. Vol.2004). That section provides further that the goals of the system include: assuring "each child's care, safety and guidance," serving "the mental and physical welfare of the child," and providing "for early identification of the problems of children and their families and respond[ing] appropriately with measures and services to prevent abuse and neglect . . . ."

In our child welfare statute, West Virginia Code Chapter 49, these elegant statements of purpose and goals are followed by the grant of substantial power to DHHR for their implementation, including an expansive definition of abuse and neglect, West Virginia Code § 49–1–3; the imposition of specific duties regarding children committed to the care of DHHR, West Virginia Code Chapter 49 Article 2; and broad powers to investigate and prosecute cases of suspected abuse and neglect, West Virginia Code Chapter 49 Articles 6 and 6A.

The allegations in Appellants' complaint asserted a failure of DHHR to utilize the statutorily designed broad array of tools at the agency's disposal to achieve for Appellants, as children, the care, safety and guidance necessary to promote their mental and physical welfare envisioned by these statutes, as well as a failure to respond appropriately with measures and services which could put an end to the abuse and neglect each of the Appellants endured from an early age and for years thereafter because of such failures.

Seen in that light, Appellants' complaint does not allege any administrative determination of fundamental policies governing DHHR, the kinds of administrative actions for which qualified immunity is designed and readily available. Rather, the amended complaint seeks recovery primarily on the theory of the negligence—including consideration of DHHR's duties arising from the agency having undertaken the custody of Appellants as children—for the failure of DHHR to adequately protect Appellants in keeping with its statutory purpose, goals and child protective powers. Accordingly, the lower court's determination that DHHR was entitled to summary judgment on the basis of qualified immunity should have failed because the

cause of action asserted by Appellants— properly analyzed—did not address an administrative determination of a fundamental policy governing DHHR, but asserted a negligent failure to perform the duties and exercise the powers afforded DHHR by law.

Had the majority properly examined the doctrine of qualified immunity, this Court would nevertheless be left with the question of whether the public duty doctrine would preclude recovery by Appellants. In many circumstances claims not barred by qualified immunity might still fail by reason of the public duty doctrine. As acknowledged in *Parkulo*, the public duty doctrine does not rest squarely on the principle of governmental immunity. It rests on the principle that recovery may not be had for the negligence of a governmental entity for its failure to perform a duty owed to the public generally, even by a member of the public directly injured by such failure. 199 W.Va. at 172, 483 S.E.2d at 518. However, we have long recognized an exception to that doctrine where it is found that the defaulting agency had established a "special relationship" with an injured party under which the agency assumed specific duties with respect to that particular injured party, as contrasted with the general public. *See Parkulo; Randall v. Fairmont City Police Dept.* 186 W.Va. 336, 412 S.E.2d 737 (1991); *Benson v. Kutsch,* 181 W.Va. 1, 380 S.E.2d 36 (1989); *Wolfe v. City of Wheeling,* 182 W.Va. 253, 387 S.E.2d 307 (1989).

A "special relationship," establishing that an agency assumed specific duties owed to a particular person injured by the alleged negligence of the agency—apart from duties owed the public generally—is established where the agency: (1) assumed an affirmative duty to act on behalf of the injured party; (2) knew that inaction on the part of its workers could lead to harm; (3) had direct contact with the injured party through its officers or employees; and (4) knew that the injured party was relying on the agency to take all necessary and reasonable steps to protect such injured party. Syl. Pt. 12, *Parkulo*. Ordinarily, the burden rests on the party claiming the benefit of the "special relationship" to prove its four elements to

the finder of fact. *See* Syl. Pt. 11, *Parkulo* (state government); Syl. Pt. 3, in part, *Wolfe v. City of Wheeling* (local government).

In the case *sub judice* it was not necessary for Appellants to prove that a "special relationship" existed between them and DHHR. As represented in the summary judgment order below, the agency conceded the existence of the relationship, establishing without more that DHHR (1) assumed an affirmative duty to act on behalf of Appellants; (2) knew that inaction on the part of its workers could lead to harm to Appellants; (3) had direct contact with Appellants through its officers or employees; and (4) knew that Appellants were each relying on the agency to take all necessary and reasonable steps to protect each of the Appellants. That is the law of the case.

Based on the foregoing, the lower court erred in entering summary judgment on the grounds of qualified immunity and by failing to take into account the impact of the public duty doctrine and its "special relationship" exception. In turn, by failing to examine the lower court's qualified immunity determination, the majority did not consider the impact of the special relationship between DHHR and Appellants on whether the discovery rule should be employed to extend the statute of limitations period.

### B. Statute of Limitations

#### 1. Preliminary Issue

There is no question that the two year statute of limitations in West Virginia Code § 55–2–12(b) (1959) (Repl.Vol.2000) was tolled during Appellants' minority as provided by West Virginia Code § 55–2–15.[2] However, our case law raises a threshold question, a subject disregarded or avoided by the majority, of whether the discovery rule can further toll the limitations period in cases where West Virginia Code § 55–2–15 is ap-

plicable in light of syllabus point five of *Albright v. White*, 202 W.Va. 292, 503 S.E.2d 860 (1998). The appellant in *Albright v. White* had attempted to invoke the discovery rule with respect to injuries which he claimed occurred about twenty-five years before the complaint was filed. Refusing to permit the case to proceed, this Court held: "The plain language of W.Va.Code § 55–2–15 (1923) (Repl.Vol.1994) clearly prohibits the application of the discovery rule to extend the *statutory filing periods* provided in this section." *Id.* at Syl. Pt. 5, 503 S.E.2d 860 (emphasis added). Thus, it would seem that West Virginia Code § 55–2–15 and West Virginia Code § 55–2–12(b) when read together establish two filing periods relevant to the present case: (1) within two years of the removal of the disability of minority and (2) within twenty years of the date of injury. A literal reading of syllabus point five of *Albright v. White* would compel a conclusion that the discovery rule may not be applied to extend the statute of limitations beyond "the number of years allowed to a person having no impediment" after the disability is removed, in this case two years after majority is attained. W.Va.Code § 55–2–15; § 55–2–12(b). However, a few years later in *Miller v. Monongalia County Board of Education*, 210 W.Va. 147, 556 S.E.2d 427 (2001), this Court considered a case brought within the twenty-year period of limitation, but after the expiration of the two-year period following removal of the disability of minority. Pointing out that *Albright v. White* involved a case filed more than twenty years after the date of injury, and that the case before the Court in *Miller* was filed less than twenty years from the date of injury, this Court said:

> Miller filed her action before the twenty year statute expired; therefore, we must now answer the questions left unanswered by *Albright*. We must determine whether the discovery rule can for any reason toll

**2.** West Virginia Code § 55–2–15 (1923) (Repl. Vol.2000) states as follows:

> If any person to whom the right accrues to bring any such personal action, suit or scire facias, or any such bill to repeal a grant, shall be, at the time the same accrues, an infant or insane, the same may be brought within the like number of years after his becoming of full

> age or sane that is allowed to a person having no such impediment to bring the same after the right accrues, or after such acknowledgment as is mentioned in section eight [§ 55–2–8] of this article, except that it shall in no case be brought after twenty years from the time when the right accrues.

the running of the 55–2–12(b) statute of limitations.

210 W.Va. at 151, 556 S.E.2d at 431. The *Miller* Court then proceeded to apply the discovery rule to toll the statute of limitations set out in West Virginia Code § 55–2–12(b), notwithstanding the fact that the suit had been filed more than two years after the appellant attained the age of majority, relying on the appellant's claim of fraudulent concealment. If the majority had been faithful to this Court's obligation under our State Constitution to consider and decide every point fairly arising upon the record, a new syllabus point should have been adopted in the present case to harmonize the *Albright* and *Miller* decisions. *See* W.Va. Constitution Art. VIII, § 4. That new point of law would represent that the plain language of West Virginia Code § 55–2–15 clearly prohibits the application of the discovery rule to extend the statutory filing periods provided by this section unless the civil action to which the discovery rule is applied has been filed within the twenty-year period permitted by this section.

The facts in the present case do parallel those in *Miller* in that Appellants filed their claim before the twenty-year statute expired and the argument for tolling the applicable two-year statute of limitations prescribed by West Virginia Code § 55–2–12(b) is based at least in part upon a fraudulent concealment

claim. Given this Court's application of the law in *Miller*, *Albright v. White* presented no obstacle to the prosecution of each Appellants' claims for injuries that occurred less than twenty years before the filing of their complaint, even though the complaint asserting those claims may have been filed more than two years after Appellants attained the age of majority, if the claims are otherwise appropriate for the application of the discovery rule.

2.  Discovery Rule

I am perhaps most perplexed and troubled with the majority's assertion that two versions of the discovery rule have developed in this State.[3] I contend that a close examination of the case law from which current, proper application of the discovery rule has evolved—beginning with *Cart v. Marcum*, 188 W.Va. 241, 423 S.E.2d 644 (1992)—demonstrates that this Court has developed a coherent jurisprudence regarding the application of the discovery rule.

In the landmark case of *Cart v. Marcum*, in which this Court extended the application of the discovery rule to all torts generally, we held in syllabus point one that "under the 'discovery rule,' the statute of limitations is tolled until a claimant knows or by reasonable diligence should know of his claim." We explained in *Cart* that because the rule was

---

**3.** I believe that the majority's self-serving evisceration of Justice Starcher's concurring opinion in *Miller v. Monongalia County Board of Education,* to support the double standard proposition is

blatantly misleading. For the sake of clarity, the portion quoted in the majority opinion is set forth here along side an unedited version of Justice Starcher's analysis:

| From the majority opinion | From Justice Starcher's Concurrence |
|---|---|
| A studious observer will note that this Court stated one form of the discovery rule in *Cart v. Marcum,* and then stated a different, more lenient form of the discovery rule in *Gaither v. City Hospital* [*, Inc.,* 199 W.Va. 706, 487 S.E.2d 901 (1997)] . . . | A studious observer will note that this Court stated one form of the discovery rule in *Cart v. Marcum,* and then stated a different, more lenient form of the discovery rule in *Gaither v. City Hospital.* While it is not perfectly clear, it appears that the Court, without specifically saying so, modified or overruled *Cart v. Marcum* in *Gaither v. City Hospital.* |
| . . . [D]ecisions such as *Keesecker* [*v. Bird,* 200 W.Va. 667, 490 S.E.2d 754 (1997) ] make clear that . . . *Cart v. Marcum* governs only those cases where the plaintiff is compelled to allege some deed by the defendant concealed the cause of action from the plaintiff. | Regardless of the Court's unstated intent, subsequent decisions such as *Keesecker* [*v. Bird,* 200 W.Va. 667, 490 S.E.2d 754 (1997),] make clear that *Gaither v. City Hospital* is the preferred statement of the discovery rule; *Cart v. Marcum* governs only those cases where the plaintiff is compelled to allege some deed by the defendant concealed the cause of action from the plaintiff. |
| *Supra* at 312. | 210 W. Va. at 153 n. 3, 556 S.E.2d 433 n. 3. |

largely developed as a response to defendant conduct that served to conceal either the tort or the wrongdoer's identity, it must "be applied with great circumspection on a case-by-case basis only where there is a strong showing" that the plaintiff was prevented from learning of the claim. *Id.* at 245, 423 S.E.2d at 648. As noted in *Cart,* to overcome the general rule—that mere ignorance of the existence of a cause of action or of the identity of the wrongdoer does not toll the statute of limitations—there must be "a strong showing of fraudulent concealment, inability to comprehend the injury, or other extreme hardship." *Id.* (footnotes omitted). We then went on to state in *Cart* that "special rules apply in a case involving particular hardship or other circumstances justifying different accrual rules." *Id.* (quoting 54 C.J.S. *Limitations of Actions* § 87(a) (1987)).

We undertook a closer examination of the meaning of what "a claimant knows or by reasonable diligence should know of his claim" from syllabus point one of *Cart* in *Gaither v. City Hospital, Inc.,* 199 W.Va. 706, 487 S.E.2d 901 (1997). The discussion in *Gaither* resulted in this Court holding that:

> In tort actions, unless there is a clear statutory prohibition to its application, under the discovery rule the statute of limitations begins to run when the plaintiff knows, or by the exercise of reasonable diligence, should know (1) that the plaintiff has been injured, (2) the identity of the entity who owed the plaintiff a duty to act with due care, and who may have engaged in conduct that breached that duty, and (3) that the conduct of that entity has a causal relation to the injury.

*Id.* at Syl. Pt. 4, 487 S.E.2d 901. Immediately following the announcement of this new point of law in the body of the opinion, this Court emphasized the objective of the holding by saying the discovery "rule tolls the statute of limitations until a plaintiff, acting as a reasonable, diligent person, discovers the essential elements of a possible cause of action, that is, discovers duty, breach, causation and injury." *Id.* at 714, 487 S.E.2d at 909.

In *Keesecker v. Bird,* 200 W.Va. 667, 490 S.E.2d 754 (1997), this Court applied the discovery rule, synthesizing the standards articulated in *Cart* and *Gaither* into a four-step process. *Id.* at 683–84, 490 S.E.2d at 770–71. When a statute of limitations question arises and no statutory prohibition to application of the discovery rule exists, the first two components in the review process involve identifying the applicable statute of limitations and establishing when the requisite elements of the tort occurred. A court then must apply the *Gaither* test to determine when the plaintiff knew or should have known of his or her possible cause of action. Finally, if the plaintiff alleges that the delay in discovering the cause of action is due to misconduct of the defendant, then the court must determine if there is a proper showing of such misconduct in keeping with syllabus point three of *Cart,* which requires "a strong showing by the plaintiff that some action by the defendant prevented the plaintiff from knowing of the wrong at the time of the injury." Although the order and depth in which these components are analyzed is naturally dependent upon the procedural posture and facts of the case under review, the factors encompass the law which has developed to provide *a uniform and singular method by which the discovery rule is to be applied in this state.*

Appellants argued that they did not have the requisite knowledge to start the running of the statute of limitations on their claims because of fraudulent concealment on the part of DHHR which affected their ability to know or when they should have known of their claims. This argument is based on the contention that they could not and did not know that they had been injured by the acts and omissions of DHHR until they read their DHHR case files and became aware that their father admitted to the agency he sexually molested them. They further maintain that they logically could not know that there was a breach of duty owed to them as individuals, let alone the causal relationship between the breach and the injuries they sustained. Consequently, the initial inquiry regarding the application of the discovery rule is whether the fraudulent concealment claim has merit because it has direct bearing on the question of what appellants *should have known.* The majority neglected to

meaningfully address the topic of fraudulent concealment as a preliminary matter or otherwise and thus did not undertake an earnest examination of Appellants' argument.

Fraudulent concealment is an equitable doctrine that operates to estop a defendant from asserting the statute of limitations as a bar to a claim because the defendant in some way prevented the plaintiff from getting the information needed to pursue a claim. *See Bailey v. Glover*, 21 Wall. 342, 88 U.S. 342, 22 L.Ed. 636 (1874). Addressing the impact of fraudulent concealment on statutes of limitations, we concluded in syllabus point four of *Miller v. Monongalia County Board of Education*,

> The general statute of limitations contained in W. Va.Code § 55-2-12(b) is tolled with respect to an undiscovered wrongdoer by virtue of fraudulent concealment when the cause of action accrues during a victim's infancy and the injured person alleges in his or her complaint that the wrongdoer fraudulently concealed material facts. The statute begins to run when the injured person knows, or by the exercise of reasonable diligence should know, the nature of his or her injury, and determining that point is a question of fact for the jury. However, pursuant to W. Va.Code § 55-2-15, no case may be brought after twenty years from the time the right accrues.

We further explained in syllabus point three of *Miller* that "[f]raudulent concealment requires that the defendant commit some positive act tending to conceal the cause of action from the plaintiff, although any act or omission tending to suppress the truth is enough." What constitutes an act or omission sufficient to toll a statute of limitations on fraudulent concealment grounds has been aptly summarized by one legal authority as follows:

> To invoke the doctrine of fraudulent concealment, the presence of which bars a defendant from asserting a statute of limitations as a defense, mere silence or unwillingness to divulge wrongful activities ordinarily is not sufficient. However, when a fiduciary relationship exists, omission by silence may constitute the supplying of false information, for purposes of determining whether the defendant fraudulently concealed the plaintiff's cause of action. That is, if a trust or confidential relationship exists between the parties, which imposes a duty to disclose, mere silence by the one under that duty constitutes fraudulent concealment and will be sufficient to toll the applicable statute of limitations. Moreover, the existence of a confidential relationship between the parties lessens, if not negates, the necessity of a showing of actual fraud to toll the statute of limitations.

54 C.J.S. *Limitations of Actions* § 120 (2005) (footnotes omitted). In the course of its discussion of the fraudulent concealment law of New Mexico in a case involving a special relationship, the U.S. Court of Appeals for the Tenth Circuit observed that:

> [t]he false statement or omission by a defendant who has a special relationship with the plaintiff may ... constitute constructive fraud.
>
> > Generally speaking[,] constructive fraud is a breach of a legal duty which the law declares fraudulent *because of its tendency to deceive others.* Such fraud may be present on the part of the fraud feasor *without any showing of dishonesty of purpose or intent to deceive[.]* (Citation omitted.)

*Ramsey v. Culpepper*, 738 F.2d 1092, 1096 (10th Cir.1984) (emphasis in original).[4] The Supreme Court of Indiana, examining the concept of fraudulent concealment in a case where the plaintiff had repressed memories of her father's acts of sexual molestation, found that the general rule that discovery of a cause of action by a parent is imputed to a child regardless of the child's actual cognition or memory could be overcome on fraudulent concealment grounds in situations where the

---

**4.** This Court similarly defined constructive fraud in *Stanley v. Sewell Coal Co.*, 169 W.Va. 72, 76-77, 285 S.E.2d 679, 683 (1981), wherein we said constructive fraud is "a breach of a legal or equitable duty, which, irrespective of moral guilt of the fraud feasor, the law declares fraudulent, because of its tendency to deceive others, to violate public or private confidence, or to injure public interests."

parent is the wrongdoer. The high court of Indiana said, "the doctrine of fraudulent concealment should be available to estop a defendant from asserting the statute of limitations 'when he has, either by deception or by a violation of duty, concealed from the plaintiff material facts thereby preventing the plaintiff from discovering a potential cause of action.'" *Fager v. Hundt,* 610 N.E.2d 246, 251 (Ind.1993).

Unlike the case before the court in *Fager,* the factual focus in the present case is not on whether Appellants knew they had been injured by their father's aberrant sexual behavior. Rather, the injury for which Appellants seek compensation is DHHR's breach of its duty to protect. Here the prominent relevant factual inquiry under the principles of the discovery rule is when and to what extent Appellants knew or in the exercise of reasonable diligence should have known: that DHHR had a duty to protect them, that DHHR breached its duty, and that the alleged breach of duty caused them injury. Thus, silence coupled with DHHR's admission of a special relationship with Appellants establishes the type of "act or omission tending to suppress the truth" or deceive others which we recognized in *Miller. Miller,* Syl. Pt. 3. Moreover, the admitted existence of a special relationship between DHHR and Appellants is the type of "particular hardship or other circumstances justifying different accrual rules" as contemplated in *Cart.* 188 W.Va. at 245, 423 S.E.2d at 648.

This Court spoke with eloquence and clarity in *Miller* as to circumstances in which a plaintiff might suffer an inability to comprehend an injury due to extreme hardship. In that opinion, which also involved children who were subjected to deviant sexual behavior, Justice Maynard stated straightforwardly:

> [W]e would be remiss if we did not at least comment on the unique situations where criminal sexual misconduct is committed on young children. The level of emotional pain inflicted on these children is beyond our understanding. Many times, the child victim feels great embarrassment, shame, and guilt, and frequently, with a child's mind, wrongly blames himself or herself.

> The child then internalizes the guilt and represses the memory, forcing it out of conscious awareness. It simply hurts too much to allow the memory of such painful and devastating events to surface in the conscious mind.

> Also, on occasion, the child is confused about the exact identity of the wrongdoer and, again, wrongly internalizes guilt, blame, or culpability. These children do not know whether they should tell someone about the abuse or not. They are fearful, confused, and uncertain, and commonly remain so for years after the statute of limitations has run. It would be a cruel system indeed that did not consider such factors in reaching a just and fair result in this arena of litigation.

210 W.Va. at 152, 556 S.E.2d at 432. The facts in the present case certainly warrant the compassionate consideration Justice Maynard urged. If such consideration had been employed in this case, it would have compelled the conclusion that due to fraudulent concealment on the part of DHHR different accrual rules were justified due to the extreme hardship thereby created.

Presented with a summary judgment motion, the trial court is required to analyze mixed questions of fact and law such as those raised in the present case in order to determine "whether there is ... [a] genuine issue of fact to be tried and inquiry concerning the facts is ... desirable to clarify the application of the law." Syl. Pt. 3, *Aetna Cas. & Sur. Co. v. Federal Ins. Co. of N.Y.,* 148 W.Va. 160, 133 S.E.2d 770 (1963). The final order in this case reveals that the lower court examined the issue of when each Appellant knew, or by the exercise of reasonable diligence, should have known of their potential claims against DHHR in order to begin the running of the statute of limitations. The order reflects the lower court's belief that Appellants were aware of their claims against DHHR because they knew of the father's acts of sexual abuse and of DHHR's involvement in each of their cases. From this perspective, it is tempting to give credence, as the majority did, to such findings of the lower court about Appellants remembering the workers at DHHR who had let them

down, their stated beliefs about the social service system being dysfunctional and Kimberly's awareness that a file had been opened in 1984 on behalf of her sister because of sexual abuse by her father, but in fact those findings do not answer the question before the lower court or this Court. These findings clearly do not address the material issues regarding when the statute of limitations began to run in this case because they fail to recognize the significance of DHHR's admission of a "special relationship" with Appellants and the attendant duty the agency owed to them as individuals. While Appellants during their deposition testimony said that they did not remember all of the details of what had occurred to them, they never claimed that the statute of limitations should be tolled based on repressed memories of being sexually abused or of DHHR being involved during that time in their lives. Rather, Appellants contend that they did not know and reasonably could not have discovered that DHHR owed them a particular duty to protect, let alone the breach of that duty, until they viewed their DHHR case records on or about October 2, 2000. DHHR asserts that Appellants had reason to know of their father's confession of sexual misconduct to the agency because they were present at meetings with DHHR when the father made the disclosure. After carefully reading the caseworker notes DHHR offered to support this contention, I simply am not convinced that only one conclusion can be reached. The May 4, 1982, caseworker notes document what occurred at a meeting involving Kimberly and her parents after Kimberly had run away from home because of a particular instance of sexual assault by the father. Teresa was not included in this meeting. The notes contain numerous remarks about the extreme emotional atmosphere of the meeting and described Kimberly as being in tears and visibly shaking. According to the notes, Kimberly's emotional state deteriorated during the meeting while the father twice denied the accusation that he sexually accosted her. While the notes indicate that the father finally admitted to the sexual misconduct with his daughter, the notes do not specifically represent that Kimberly was in the room at the time the confession occurred

or that she was emotionally capable of understanding that it occurred. While it is clearly documented in the notes that Kimberly was escorted out of the room by one of the workers because she was too "emotionally shaken to continue," they do not conclusively establish when this occurred. The meeting at which Teresa allegedly heard her father confess occurred on August 3, 1984. In June of that year, Teresa ran away from home at age fifteen after her father raped her. Kimberly was not at the meeting. The notes of this meeting document that the father made the statement that "it would not happen again" and Teresa responded, "that was what he had said before to Kim." What "it" was and what had happened before were not explained in the notes; no clear confession of the father's misconduct was recorded in the August 3 meeting notes. Additionally, the father's confession is not the sole consideration. Appellants contend that the confession only served as a catalyst for Appellants—to file criminal charges against the abusive father and then to inquire about whether there was a way to recover for the injuries they sustained. To decide if Appellants acted with reasonable diligence to acquire this information necessarily involves the examination of such issues as whether others in similar situations would routinely examine government records, would be aware that a governmental entity may owe a duty to individual citizens or would understand that the State could be named in a suit.

The evidence raises questions of fact under the unique circumstances of this case that need to be resolved in order to apply the law, that is, to determine the onset of the limitations period. As the determination of these ultimate facts are predominantly rooted in fact rather than law, summary judgment is not appropriate. As concluded by the authors of a monograph developed for the Federal Judicial Center entitled *The Analysis and Decisions of Summary Judgment Motions,* when resolution of ultimate facts turns on the assessment of human behavior and expectations, the matter ordinarily is one for the jury. The authors of the monograph suggest that in order to arrive at a principled resolution of the court-versus-jury issue before the court at the summary judgment

stage, it is well to view facts and law at two separate ends of a spectrum with mixed questions of law and fact filling the gap between the two. The range of the fact-law spectrum is explained in the monograph as follows:

> At one extreme of this spectrum lie so-called historical facts. A historical fact is a thing done, an action performed, or an event or occurrence. Some historical facts may be proved by direct evidence. Others, such as notice, intent, or other states of mind, are proved by inference from evidence of other facts. The resolution of disputes over historical facts or the inferences to be drawn from them is a jury function. A dispute over historical facts or inferences, if genuine and material within the meaning of Rule 56, precludes summary judgment.

> At the other extreme of the spectrum lie issues of law. When the facts material to the application of a pure rule of law are undisputed, the application is a matter of law for the court, requiring no trial.... When there is no dispute over the sufficiency of evidence establishing the facts that control the application of a rule of law, summary judgment is the appropriate means of deciding the issue....

> When the application of a rule of law depends on the resolution of disputed historical facts, however, it becomes a mixed question of law and fact. Plaintiff's standing to sue, for example, may turn on activities of the plaintiff that are in dispute. Whether the statute of limitations has run may depend on a dispute over when plaintiff received notice. Such disputed facts normally preclude summary judgment.

> Mixed questions of law and fact arise in a variety of other forms. Normally, the legal questions presented are resolved by the court and the fact issues by the jury. Contract disputes, though frequently questions of law, may present mixed questions; when the court determines that a document is ambiguous, for example, the jury resolves evidentiary disputes such as what the parties intended. Constitutional issues, though generally questions of law, may be mixed questions when they turn on factual determinations.

> Although the terms are sometimes used interchangeably, it is useful to distinguish mixed questions of law and fact from questions of ultimate fact. Mixed questions generally require the resolution of disputes over historical fact. Ultimate facts present a different kind of "factual" inquiry, one involving a process that "implies the application of standards of law." [*Baumgartner v. U.S.*, 322 U.S. 665, 671, 64 S.Ct. 1240, 88 L.Ed. 1525 (1944).] Like some historical facts, ultimate facts are derived by reasoning or inference from evidence, but, like issues of law, they incorporate legal principles or policies that give them independent legal significance. They often involve the *characterization* of historical facts, and their resolution is generally outcome-determinative.

> Ultimate facts occupy a broad segment of the spectrum between fact and law. Where on that spectrum a particular ultimate fact belongs depends on whether it is predominantly factual or legal. For example, whether a defendant used due care in the operation of a vehicle or was driving in the course of employment or whether that person's acts were the proximate cause of plaintiff's injuries are all questions of ultimate fact that are predominantly factual rather than legal and therefore clearly for the jury. Similarly, whether a person had reasonable cause, acted within a reasonable time, or can be charged with notice are predominantly factual (though outcome-determinative) questions. The resolution of such questions turns on an assessment of human behavior and expectations within the common experience of jurors. Concerning issues of this sort, traditionally resolved by juries, the Supreme Court [in *Railroad Co. v. Stout*, 17 Wall. 657, 84 U.S. 657, 664, 21 L.Ed. 745,] said in 1873: "It is assumed that twelve men know more of the common affairs of life than does one man, that they can draw wiser and safer

conclusions from admitted facts thus occurring than can a single judge."

Near the opposite end of the spectrum lie those ultimate facts that, though nominally facts, have a high law content. Their resolution (in the absence of evidentiary disputes) turns on matters of law and policy and on technical issues underlying the legal scheme. The administration of the rules under which they arise benefits from consistency, uniformity, and predictability. Whether an instrument is a security, whether a plaintiff is a public figure, whether a publication is not copyrightable as historical, whether an invention was reduced to practice, and whether a carrier operated as a common carrier are questions of ultimate fact calling for the interpretation and application of essentially legal standards.

Schwarzer, Hirsch & Barrans, *The Analysis and Decision of Summary Judgment Motions,* 139 F.R.D. 441, 455–457 (1992) (footnotes omitted).

Following this reasoning, it comes as no surprise that a great majority of the cases where the question of whether a claim is barred by a statute of limitations is found to be a question of fact for the jury or trier of fact. *See* Syl. Pt. 4, *Miller;* Syl. Pt. 3, *Stemple v. Dobson,* 184 W.Va. 317, 400 S.E.2d 561 (1990) (also internally listing cases supporting the proposition); *see also Aldrich v. McCulloch Properties, Inc.,* 627 F.2d 1036, 1042 (10th Cir.1980) ("[t]he question of whether a plaintiff should have discovered the basis of his suit under the doctrine of equitable tolling does not lend itself to determination as a matter of law"). Unless the facts are so clear as to admit of no other conclusion than that the discovery rule does not apply, the issue is for the jury to draw from the evidence such inferences as may be appropriate. The facts in this case hardly favor such certainty.

In summary, the majority has sanctioned an application of the principal of common law qualified immunity to facts that do not justify its use. The majority has ignored the special relationship between Appellants, as children, and DHHR, resulting in a failure to consider the impact of that special relationship on Appellants' claim of the benefit of the discovery rule. Finally, contrary to well-established law, the majority has allowed the lower court to intrude into fact-finding regarding the proper application of the statute of limitations and the discovery rule where genuine issues of fact cry out for jury determination to clarify the proper application of the law of limitations and the discovery rule in Appellants' case.

What dismays me the most is that all of this has occurred in a case decided in what our Court—at the behest of a member of the majority—has declared to be the "Year of the Child." Contrary to the eloquent declaration of Justice Maynard in the *Miller* case, that the Court would listen with great care to those injured in their childhood and seeking relief many years later, Appellants are turned out into the cold, with a mixed signal to similarly situated individuals and the practitioners in our legal system. On the one hand, this Court claims profound interest in protecting children from abuse and neglect, while, on the other, refusing a full hearing to Appellants who claim that the system failed them during their childhood.

The "King's Purse" has been protected. In this "Year of the Child," the claims of negligent injury of children by the arm of the state designated to protect them have been summarily rejected.

Accordingly, I have no choice but to voice my sincere and sad dissent.

I am authorized to state that Judge Madden joins in this dissenting opinion.